**Wilbur E. SCARBOROUGH, Plaintiff,**

**v.**

**Andrew NATSIOS, Administrator, United States Agency for International Development, Defendant.**

**No. Civ.A. 99–2454(ESH).**

United States District Court, District of Columbia.

March 20, 2002.

Raymond Charles Fay, Bell, Boyd & Lloyd, Washington, DC, Steven Jeffrey Silverberg, Washington, DC, for Plaintiff.

Paul Mussenden, U.S. Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff Wilbur Scarborough brings this action for discrimination and retaliation pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* Scarborough, an African-American male born on September 19, 1939, is a former employee of the United States Agency for International Development ("USAID"). Defendant has moved to dismiss four of the twelve counts of plaintiff's complaint and seeks summary judgment on all twelve counts. At oral argument on March 7 and 8, 2002, the Court granted defendant's motion for summary judgment with regard to Counts III–IV, VI–XI, and part of Count XII. Upon consideration of the pleadings and the entire record contained therein, as well as the issues raised at the hearing on March 7 and 8, the Court now denies defendant's motion to dismiss, but grants summary judgment with respect to plaintiff's remaining claims.

## BACKGROUND

### I. Plaintiff's Employment and Medical History

At all times relevant to this action, plaintiff worked for USAID as a Program Officer in the Foreign Service. His career with USAID began in 1974, and prior to becoming a Program Officer, plaintiff served, *inter alia*, as an Agricultural Rural Development Specialist in Tanzania, Kenya, Sierra Leone, and Niger. From April 1988 to June 1992, plaintiff worked in Jakarta, Indonesia. While there, as is the case with many USAID workers, he contracted a gastrointestinal parasite, which was subsequently diagnosed as amebiasis. (Pl.Ex. 2, ¶ 2; Pl.Ex. 4; Def.Ex. 2, at 22:23–5; Def.Ex. 9, at 125:14–126:15.) Plaintiff contracted the parasite in 1988 and was treated for diarrhea. Scarborough also experienced sinus and allergy trouble in Indonesia, and at one point was rushed to Singapore for emergency treatment of a recurrent acute staphylococcus aureus infection. (Pl.Ex. 1, at 3; Pl.Ex. 2, at 23:4–24:4.)

In 1990, plaintiff contacted the Equal Employment Opportunity ("EEO") office in Jakarta regarding a dispute with his supervisor, Robert Navin. This complaint was handled informally by plaintiff and Navin, and according to plaintiff, a "truce" was reached regarding the situation. (Def.Ex. 3, at 175:13–176:23.) In April 1991, plaintiff decided that he wished to retire and began exploring ways to receive disability retirement. (Def.Ex. 10, at 15.)

A typical overseas Foreign Service assignment lasts approximately four years, and Foreign Service officers are generally assigned to Washington D.C. after eight years abroad. (Def.Ex. 9, at 30:2–8, 31:9–18.) On June 27, 1991, plaintiff submitted a "Completion of Assignment Report," in which he provided information that he wished to be considered in connection with his next assignment after Indonesia. He requested that he not be transferred to Washington, D.C. because of his "chronic hay fever/sinus allergy." (Def.Ex. 12, at 2.) Instead, Scarborough sought a post in Uganda, Egypt, Gambia, or Bangladesh. (*Id.* at 1; Def.Ex. 2, at 152:19–24.)

Nonetheless, plaintiff was reassigned to Washington, D.C. as of August 1992. On October 6, 1992, plaintiff obtained an unlimited medical clearance for worldwide assignment after undergoing a physical examination conducted by the Department of State's Office of Medical Services. (Def.Ex. 8, at 1.) During the physical, amoebic parasites were identified in laboratory tests. (Def.Ex. 2, at 52:16–53:8.) Plaintiff filed a claim with the Office of Workers' Compensation ("OWCP") at the Department of Labor ("DOL") for this condition, and the claim was accepted for the specific condition of amebiasis on January 14, 1993. The date of the injury was identified as May 14, 1992. (Def.Ex.13.)

Plaintiff continued to experience health problems after returning to Washington, D.C. in August 1992. He contends that he could not sleep; had less energy, felt pain in his joints, feet, ankles, elbows, and knees; experienced gastrointestinal problems; suffered from flu-like symptoms; and had difficulty walking. (Amended Complaint ¶¶ 16–17; Pl.Ex. 1, at 3; Pl.Ex. 2, ¶ 3; Pl.Ex. 3, ¶ 3.) On January 25, 1993, Scarborough assumed the position of Assistant Country Development Officer in the Office of East Africa Affairs in the District of Columbia. This was functionally the equivalent of a Program Officer position. Plaintiff's first-level supervisor in that job was Gerald Cashion. Scarborough was absent from the office for a substantial amount of time during his first six months in the position. During that period, he used all of his annual and sick

leave for the year, and was placed on Leave Without Pay ("LWOP") status for part of the time. Some of Scarborough's absences resulted from his attendance at the funerals of his father and brother in Chicago; the rest were due to rheumatism and bone soreness. (Def.Ex.15, ¶ 3.)

As plaintiff states, "[b]ecause of his illnesses, [Scarborough] was unable to steadily work full-time at his position from May 1, 1993 to the time of his retirement on September 29, 1994." (Pl.Opp. at 6.) Beginning in June 1993, plaintiff provided some documentation from physicians regarding his medical condition. During this period, plaintiff was treated for "HTN," "arthritis," and "anemia" (Def.Ex. 16, June 21, 1993 Doctor's Note), "arthritic pain" (Def.Ex. 17, July 20, 1993 Doctor's Note), "arthritic pain," "HTN," "recurrent diarrhea," and his "allergic condition" (Def.Ex. 18, at 2, Aug. 2, 1993 Doctor's Note), "reactive arthritis associated with the gastrointestinal infestation by amoeba and, possibly, giardia" (Def.Ex. 19, at 3, Aug. 23, 1993 Doctor's Note), a "gastrointestinal complaint" (Def.Ex. 20, Aug. 25, 1993 Doctor's Note), "reactive arthritis," (Def.Ex. 21, at 2, Oct. 8, 1993 Attending Physician's Report; Def.Ex. 22, Nov. 13, 1993 Doctor's Note), and the "flu." (Def.Ex. 23, Nov. 15, 1993 Doctor's Note.)

At the same time, USAID repeatedly advised plaintiff of the consequences of his frequent absences in light of the "inadequate medical documentation" that he had provided. (Def.Mem. at 12.) On July 15, 1993, Cashion issued a leave restriction letter notifying plaintiff that failure to follow specific procedures would result in his being classified as Absent Without Leave ("AWOL") for any more missed work. (Def.Ex. 25, at 3.) Just eight days later, Cashion wrote plaintiff to inform him that he was being charged as AWOL for July 19 and 20, because the medical documentation he had submitted for those two days "does not suggest that you were incapacitated and therefore unable to come to work. . . ." (Def.Ex.26.) Cashion reiterated this policy in memos to plaintiff dated September 3 and October 5, 1993. (Def.Exs.27–28.) Plaintiff alleges that he made his first request that these missed workdays be classified as LWOP, rather than AWOL, in September 1993.[1] (See Pl.Opp. at 6; Pl.Ex. 22.) This request was denied. At the end of the same month, plaintiff was turned down for another job within USAID for which he had applied, in the Office of Development, Bureau for Private Enterprise. (Def.Ex. 15, at 2.)

On November 16, 1993, plaintiff was notified that he had been selected out for mandatory retirement, which was to become effective April 30, 1994. (Def.Ex.33.) Plaintiff filed a grievance in response to this decision on April 20, 1994, arguing that 1) a relevant evaluation from 1993 was not reviewed by the boards that chose plaintiff for mandatory retirement, and 2) the boards committed a procedural error because members of the preliminary selection board also served on the Performance Standards Board that made the final determination of forced retirement. (Def.Ex.34.) Pursuant to USAID procedures, plaintiff was granted "prescriptive relief," and thus, his mandatory retirement was stayed until a decision was reached on his grievance. (Def.Ex. 30, at 157.)

---

1. There is no difference between LWOP and AWOL in terms of pay or benefits. However, an employee on LWOP status has been granted absence by his supervisor, while an employee who is AWOL has not. (Pl.Ex. 25, at 41:1–17; 137:12–138:7.) Moreover, "AWOL is not an adverse nor a disciplinary action. However, ... a continued accrual of time in AWOL status may ultimately serve as the basis for a disciplinary action...." (Def.Ex. 25, at 3.)

Plaintiff's absences continued following his selection for mandatory retirement. Between October 1993 and June 1994, plaintiff missed work and was placed on AWOL for 976 hours over 19 pay periods. That is, plaintiff missed nearly two-thirds of the 1520 hours that comprised those pay periods, and was AWOL for at least part of each of the 19 periods. (Def.Ex. 46, at 3.) Scarborough visited several doctors during this timeframe. On December 15, 1993, Dr. Marc Hochberg, a professor of medicine at the University of Maryland, wrote that Scarborough "no longer ha[d] the arthritis-related disabilities in activities requiring mobility and exercise tolerance and he is able to fulfill his job requirements. There is no reason, medically, why he can no longer work at his chosen occupation." (Def.Ex.35.)[2] This diagnosis was supported by another doctor, who wrote eight days later that plaintiff's "symptoms [were] under control, so he should be able to fulfill his requirements for his job." (Def.Ex. 36, Dec. 23, 1993 Note from Dr. Gaurang Thaker.) Less than three weeks later, however, a third doctor found that Scarborough had "not been able to attend work because of his severe fatigue [and that] possible chronic fatigue may hinder his ability to attend work in the future." (Def.Ex. 37, Jan. 10, 1994 Doctor's Note; see also Def.Ex. 38, at 4, Jan. 27, 1994 Doctor's Note ("[I]t is possible that the patient does have a chronic fatigue syndrome." ("CFS")).)

In March 1994, in response to his prolonged absence from work, USAID requested that plaintiff undergo an Agency physical examination.[3] (Def.Exs.40, 46.) However, plaintiff says that he believed that the exam would be too physically rigorous, given his existing medical condition, and declined to comply. (Def.Ex. 2, at 110:6–111:13.) Two months later, Dr. Mohamed Al–Ibrahim, the Head of General Internal Medicine at the University of Maryland's School of Medicine, provided the most conclusive diagnosis of CFS to that point. "Basically, we have an individual previously in fairly good to excellent health who has debilitating fatigue, musculoskeletal pains, poor sleep, concentrating difficulty, and headaches. In my opinion the medical picture is consistent with chronic fatigue syndrome." (Def.Ex. 44, at 2, May 16, 1994 Note from Dr. Al–Ibrahim.) On May 18, however, USAID's Assistant Director for Medical Clearances assessed plaintiff's condition differently, based on an examination of plaintiff's file, and found "nothing ... to explain or justify his frequent absences from work."[4] (Def.Ex.43.)

Throughout this period, plaintiff failed to report for work on a consistent basis. His April 12, 1994 employee evaluation report ("EER") for the period from April 1, 1993 to March 31, 1994 reflected this. "Mr. Scarborough's performance and attitude fell far short of what is expected of a Foreign Service professional with his many years of experience." (Def.Ex. 42,

---

**2.** Previously, on October 8, 1993, Dr. Hochberg wrote that plaintiff was able to resume regular work and that there were no permanent effects expected from the reactive arthritis. (Def.Ex.21.)

**3.** Defendant ordered this exam and subsequent exams pursuant to 3 FAM 672 § 3–2b(5), which provides: "When the appropriate agency personnel office believes that a participant may be totally disabled or incapacitated for useful and efficient service ... it

may, after consultation with the Medical Director, direct the participant to report to the Medical Director of the Department of State and the Foreign Service for [a] fitness-for-duty-exam." (Def.Ex. 46, at 3.)

**4.** It is unlikely that the May 16 Al–Ibrahim letter was in plaintiff's file at the time of this assessment, which occurred just two days after the date on the letter.

at 3.) This evaluation contrasted sharply with the performance reports that had been issued to plaintiff over the preceding five years, which were uniformly positive. (Pl.Ex.7, ¶ 5.) Pursuant to applicable regulations, the 1993–94 EER did not mention plaintiff's medical condition.[5]

In June 1994, plaintiff failed to respond to a second Agency request for a fitness-for-duty examination. (Def.Ex. 10, at 20; Def.Ex. 46, at 2.) On July 6, 1994, USAID's Office of Human Resources issued Scarborough a notice of proposed suspension without pay for twenty days for absence without leave and failure to follow instructions. (Def.Ex.46.) This notice documented plaintiff's repeated lack of attendance at work since he had been reassigned to Washington D.C. in 1992, as well as the Agency's reply to his absences. In response to the notice of proposed suspension, on July 13, 1994, plaintiff made his first and only written request for accommodation for his illness.

> Due to ongoing recurrences of my illness, I hereby request whenever my sick leave is exhausted to be placed on Leave Without Pay (LWOP) status at any time that I am unable to report to work. The attached documentation explains the Chronic Fatigue Syndrome that inhibits my performance from time to time. Your approval of this request would be greatly appreciated.[6]

(Def.Ex.47.) Plaintiff attached the May 16, 1994 note from Dr. Al–Ibrahim to support his assertion that chronic fatigue syndrome "inhibits my performance from time to time." (Def.Ex.47.) At the time plaintiff submitted this request for LWOP, he

had been designated AWOL for 976 of his last 1520 work hours, from October 1993 to June 1994. (Def.Ex. 46, at 3.)

On August 26, 1994, Cashion denied plaintiff's request for LWOP. Cashion's response delineated the Agency's LWOP policy, and concluded that plaintiff had not met the requirements for that designation.

> First, Handbook 27, Chapter 7, section 7H provides that "all requests for LWOP must be in writing and include proposed beginning and ending dates of the requested period, and reason(s) for the request." Your memo did not include the "proposed beginning and ending dates."
>
> Second, 3 FAM 471.6 states that LWOP will be granted "for the purpose of recovering from illness or disability not of a permanent or disqualifying nature when continued employment or immediate return to employment would threaten impairment of the employee's health or the health of other employees. LWOP for reasons of health must be supported by a medical certificate."
>
> I have reviewed the attachments to your memo of July 13. I note that the letter from Dr. Hochberg dated 15 December 1993 states: "There is no reason, medically, why he can no longer work at his chosen occupation." The letter from Dr. Thurang [sic] dated 23 December 1993 states: "He can, nonetheless, work at his chosen occupation at this time." The letter from Dr. Al–Ibrahim ... does not state, nor does he suggest, that your physical condition prevents you from reporting for work. Thus, the attach-

---

5. *See* 42 U.S.C. § 12112(d)(3)(B); 29 C.F.R. §§ 1614.203(e)(4), 1630.14(c)(1) (requiring that medical information be kept confidential and maintained in separate files).

6. Cashion's response to this request indicates that plaintiff included with his letter the De-

cember 15, 1993 note from Dr. Hochberg (Def.Ex.35), the December 23, 1993 note from Dr. Thaker (Def.Ex.36), and the May 16, 1994 note from Dr. Al–Ibrahim (Def.Ex.44). (*See* Def.Ex. 48.)

ments do not appear to adequately support your request. . . .

"In light of the above, I regret I am unable to concur with your request. However, please feel free to submit any other appropriate documents that you believe may be helpful and I will be happy to reconsider your request."

(Def.Ex. 48, at 1–2.) The same day, USAID's Office of Human Resources again ordered plaintiff to undergo a medical examination to enable the Agency "to make a decision on the proposed suspension action." (Def.Ex.49.) Plaintiff neither reported for the scheduled examination nor requested rescheduling. (Def.Ex.50.)

Throughout this process, plaintiff's grievance over his selection out for mandatory retirement was pending. On September 6, however, he withdrew the grievance and stated that he would "mandatorily retire on or before September 29, 1994 as directed." (Def.Ex.51.) On September 12, 1994, plaintiff submitted an application for retirement requesting a "date of final separation" of September 29, 1994. (Def.Ex. 52, at 1.) Six days before he was scheduled to retire, on September 23, 1994, Scarborough reported to the Veterans Administration Hospital in Baltimore, Maryland for an examination, the purpose of which was listed as "separation." (Def.Ex.53.) Plaintiff had requested that the examination be conducted by a physician with experience in diagnosing chronic fatigue syndrome. (Def.Ex. 2, at 111:24–112:5.) Dr. James McPhillips examined plaintiff and found that he "has classical history of chronic fatigue syndrome as recognized by the Veterans Administration." (Def.Ex. 53, at 3.) But as had consistently been the case, the doctor expressed no opinion as to the severity of plaintiff's illness or its effect on his ability to work.

On September 29, 1994, plaintiff retired from USAID. Although the application for retirement indicated that his departure was an "involuntary separation" or a "selection out" (Def.Ex.52), plaintiff testified in his deposition that he decided to retire, and that retirement itself was "not a big thing." (Def.Ex. 3, at 237:21–22.) Moreover, plaintiff specifically explained that he did not retire as a result of the selection out in November 1993.

Q: So isn't it true, Mr. Scarborough, that when you say you were forced to retire, you're not saying that the Agency's decision to mandatorily retire you was the basis for your retirement, are you?

A: No, because at that time, the mandatory retirement was still being adjudicated in the grievance process. It was still going forward. I didn't know how soon they were going to reach a decision, but I was optimistic ultimately I would, you know, prevail, but it was still being adjudicated.

(Def.Ex. 1, at 157:4–13.) In a subsequent deposition, plaintiff reiterated that the selection out did not lead to his retirement.

Q: Sir, you didn't retire because of the Agency's decision to mandatorily retire you, did you?

A: I retired because the Agency refused to allow me to have the rest, vis-a-vis, leave without pay which was needed for me to attempt to recover a modicum of health, and they refused. My health has to dictate my actions.

(Def.Ex. 3, at 234:6–11.)

## II. Plaintiff's Worker's Compensation Claim

On January 14, 1994, Scarborough submitted an Office of Worker's Compensation Programs ("OWCP") claim for reimbursement of his use of annual and sick leave between October 1992 and October 1993 due to amebiasis. (Def.Ex.54.) According to plaintiff, in February 1994,

Cashion refused to reclassify as reimbursable 158 hours of time for which plaintiff had been designated AWOL in July–October 1993. Plaintiff also contends that Navin refused to process paperwork for the worker's compensation claim at approximately the same time. (*See* Pl.Ex. 29.)

On March 30, 1994, plaintiff was granted compensation for 388 hours of leave, totaling $9,290.98, between October 9, 1992 and July 8, 1993. (Def.Ex.55.) On June 28, 1994, the compensation was reviewed and increased to $10,452.33 over the period from October 8, 1992 to August 16, 1993. (Def.Ex. 56, at 1.) In an October 24, 1994 letter, OWCP approved the buy back of 316 hours of leave in the amount of $10,452.33. (Def.Ex.58.) Following plaintiff's retirement, Joan King, the manager of USAID's payroll office at the OWCP, conducted a routine leave audit to confirm his payment amount. (Def.Ex. 60, at 1–2.) This audit determined that plaintiff had a balance of only 208 hours of annual leave, instead of the 316 hours that OWCP had previously recorded, thereby reducing plaintiff's gross compensation to $7,760.48. (Pl.Ex. 9, at 5–6.) At no time had plaintiff and King met. (Def.Ex. 3, at 211:17–19.)

### III. Procedural History

In addition to his informal 1990 complaint with the EEOC office in Jakarta, Scarborough filed three formal complaints of discrimination with the EEOC.[7] These three complaints were consolidated before an EEOC administrative judge, who held a two-day hearing on October 5 and 6, 1998. The judge found that the Agency had discriminated against plaintiff on the basis of disability when he was placed on non-pay status from January to September 1994, but denied all of his other claims. (Pl.Ex. 1, at 7, 10.)

Scarborough filed this action in federal court on September 15, 1999. Plaintiff has brought a twelve-count complaint relating to five events. First, plaintiff alleges in Count I that defendant violated the Rehabilitation Act when it failed to reasonably accommodate his handicaps insofar as it did not place him on LWOP status, transfer him to another position, or place him on a medical complement. Second, plaintiff asserts in Counts II–IV that defendant discriminated against him because of his handicaps, age, and race when it forced him into retirement. Third, plaintiff contends in Counts V–VII that defendant's failure to grant him LWOP from July 1, 1993 to September 30, 1994 constituted disparate treatment as a result of his handicaps, and discrimination on the basis of race and age. Fourth, plaintiff argues in Counts VIII–X that his EER for the period April 1, 1993 to March 31, 1994 was "far lower than he deserved," and that this constituted disparate treatment because of his handicaps, and discrimination based on his age and race. Fifth, plaintiff asserts that defendant retaliated against him for engaging in protected activity (i.e., filing complaints of discrimination with the EEOC in 1990 and February 1994) when it gave him the April 1, 1993 to March 31, 1994 EER (Count XI), refused to authorize the sick leave buy-back that had been approved by the Department of Labor after his retirement, failed to process in February 1994 all required worker's compensation forms in a timely manner, refused to amend 158 hours of leave wrongly classified as AWOL, and neglected to advise

---

**7.** Plaintiff initiated EEOC counseling on February 17, 1994. (Amended Complaint ¶ 96.) On April 11, 1994, plaintiff filed a complaint of discrimination on the basis of race, handicap, age, and reprisal; he filed a second complaint of discrimination on the basis of handicap, age, and reprisal on September 15, 1994, and a third complaint on the basis of race, age, and reprisal on November 21, 1995. (Amended Complaint ¶ 6.)

OWCP of the recurrence of his disability (Count XII). Defendant has moved to dismiss the forced retirement and worker's compensation claims, and seeks summary judgment on all claims.

On March 7 and 8, 2002, the Court heard oral argument on defendant's motion. At the hearing, the Court gave the parties the opportunity to comment on the applicability of the recent Supreme Court decision in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), and provided plaintiff with the chance to clarify several of the counts in the complaint. In particular, the Court sought specification as to the types of reasonable accommodations that plaintiff allegedly sought, including an identification of each accommodation, the date when it was requested, an elaboration of plaintiff's forced retirement claim, and clarification of plaintiff's retaliation claim as set forth in Count XII. The Court also afforded both parties the opportunity to provide additional legal support for their arguments.

At the conclusion of oral argument, the Court granted summary judgment for defendant with respect to Counts III, IV, VI, VII, VIII, IX, X, and XI. Summary judgment was also granted in part with respect to Count XII, but the Court took under advisement plaintiff's claim that Cashion retaliated against him by failing to reclassify 158 hours of AWOL time. The Court also reserved ruling on defendant's motion to dismiss and on three claims relating to the Rehabilitation Act—Counts I, II, and V. These issues are addressed below.

## LEGAL ANALYSIS

### I. Motion To Dismiss

Defendant has moved to dismiss plaintiff's forced retirement claims on the ground that they are untimely, or, in the alternative, for failure to state a claim because Scarborough voluntarily retired. In addition, defendant has moved to dismiss plaintiff's worker's compensation claim for failure to exhaust administrative remedies. For the reasons set forth below, defendant's motion to dismiss will be denied.

### A. Forced Retirement Claim

1. Timeliness

 A federal employee alleging employment discrimination under Title VII must first file a an administrative claim with the employing agency in a timely manner, and must exhaust administrative remedies before bringing an action in federal court. *Brown v. GSA*, 425 U.S. 820, 832–33, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). An EEOC regulation governs the time limit for initially filing a discrimination claim with a counselor. "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1613.201.

Defendant contends that because plaintiff was notified of his selection out on November 16, 1993, but did not contact the EEOC until February 17, 1994, his complaint was not timely. This is a misinterpretation of the EEOC regulation. As the plain language of the regulation indicates, the 45–day filing period begins to run from the "effective date of the [personnel] action," not from notice of that action. This is the interpretation that the EEOC itself has found persuasive, *DAVIS v. HENDERSON*, 2001 WL 337742, at *1 (E.E.O.C. March 28, 2001), and the Court agrees. The effective date of plaintiff's mandatory retirement was to be April 30, 1994. He contacted the EEOC more than two months before that date and filed a

formal claim of discrimination on April 11. Both of those dates obviously fall within the 45–day post-personnel action filing period. Plaintiff's claim was therefore timely filed with the EEOC, and defendant's motion to dismiss the forced retirement claims on statute of limitations grounds will be denied.

### 2. Failure To State A Claim

■ Defendant next argues that plaintiff's forced retirement claim in Count II should be dismissed because plaintiff voluntarily retired from his job with USAID. According to defendant, plaintiff cannot sue for discrimination based on a forced retirement that never occurred.

Under Rule 12(b)(6), dismissal is appropriate only where a defendant has "show[n] 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1442 (D.C.Cir.1989) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Defendant falls short of meeting this burden. Plaintiff contends that "[b]ecause of defendant's failure to accommodate plaintiff's disability, his health deteriorated and he was unable to perform his usual work activities." (Pl.Opp.70.) In effect, plaintiff appears to be arguing that he was constructively discharged from USAID because of defendant's refusal to accommodate him.[8] The facts surrounding this supposed forced retirement are disputed, and therefore, defendant's motion to dismiss for failure to state a claim is denied.

**8.** Defendant cites to two admissions by Scarborough that, according to defendant, demonstrate that plaintiff retired voluntarily. Defendant has misconstrued these admissions. Neither statement supports the assertion that plaintiff voluntarily retired on September 29,

### B. Worker's Compensation Claim

■ Defendant next argues that plaintiff's claim in Count XII regarding his worker's compensation payment should be denied for failure to exhaust administrative remedies. Defendant contends that plaintiff failed to exhaust his administrative remedies because he did not appeal USAID's decision dismissing this claim.

Under *Siegel v. Kreps*, 654 F.2d 773 (D.C.Cir.1981), which defendant cites to argue that the worker's compensation claim is not properly before the Court, "[t]he principal exhaustion requirement is that the complainant must initially seek relief in the agency which has allegedly discriminated against him." *Id.* at 776 (citing *Brown*, 425 U.S. at 831, 96 S.Ct. 1961). Scarborough did this by filing a complaint regarding his worker's compensation payment with USAID's EEO Office. (Def.Ex.62.)

Moreover, plaintiff appealed the issue of whether he "was retaliated against when the agency failed to execute the sick leave buy-back authorized by the Department of Labor, Office of Workers' Compensation Programs." (Pl.Ex. 1, at 2 (EEOC Findings and Conclusions, Jan. 11, 1999).) Plaintiff sought relief regarding the worker's compensation claim within the Agency that he alleged had discriminated against him, and he appealed at least part of that claim to the EEOC. The "lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.

1994; the fact that Scarborough had been exploring the idea of retirement before he was selected out does not mean that his retirement at that particular time was not forced by the Agency. (*See* Def.Ex. 10, at Admissions 34, 38.)

1995) (citing *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994)). Plaintiff's sole remaining worker's compensation claim—that Cashion retaliated against him by failing to reclassify 158 hours for which Scarborough had been designated AWOL—is arguably related to the claim he raised before the ALJ, i.e., that defendant retaliated against him by failing to authorize the sick leave buy-back in October 1994. Moreover, plaintiff specifically raised the 158–hour claim in his formal complaint to the EEOC. (Def.Ex. 62, at 2.) The Court therefore finds that plaintiff has exhausted his administrative remedies with regard to the worker's compensation claims, and as a result, defendant's motion to dismiss will be denied.

## II. Motion for Summary Judgment

### A. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive summary judgment, the nonmovant must provide evidence that would permit a reasonable jury to find in his favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham*, 813 F.2d at 1242. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases, ... a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, 1998 WL 164780 at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, 1999 WL 825425 (D.C.Cir. Sept. 27, 2000).

The remaining counts still under consideration—Counts I, II, V, and part of XII—are brought under the Rehabilitation Act. As noted, these claims relate to four separate events—1) defendant's failure to accommodate plaintiff's disability by placing him on LWOP or making other reasonable arrangements (Count I); 2) plaintiff's forced retirement (Count II); 3) defendant's failure to grant plaintiff LWOP from July 1, 1993 to September 30, 1994 (Count V); and 4) Cashion's failure to reclassify 158 hours of AWOL time (Count XII).

The three-part "shifting burdens" test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable to all of

plaintiff's claims.[9]

First, the plaintiff has the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a mere pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. Once the defendant has proffered non-discriminatory reasons for the termination, the plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.'" *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (citing and quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994)). "Filing a Title VII action ... is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay-*

*Adams Hotel*, 942 F.Supp. 1, 9–10 (D.D.C. 1996). "Once the employer has articulated a non-discriminatory explanation for its action, ... the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (quotation marks and citation omitted); *see also Vasilevsky v. Reno*, 31 F.Supp.2d 143, 149 (D.D.C.1998) ("[P]laintiff must do more than just deny or criticize the proffered reasons of the defendant.").

**B. Discrimination Claims**

1. Rehabilitation Act Claims

Plaintiff makes two types of disability claims—first, that defendant failed to accommodate his disability (Count I), and second, that defendant subjected him to disparate treatment on the basis of his disability (Counts II and V). As to both of these types of claims, defendant argues that plaintiff cannot sustain a prima facie case of discrimination for a variety of reasons.

The Rehabilitation Act prohibits federal agencies from discriminating against qualified persons with a disability. Under the Act, "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity ... conducted by any Executive agency...." 29 U.S.C. § 794(a). Section 501 of the Act further mandates that employers take affirmative steps to provide for qualified persons with disabilities. 29 U.S.C. § 791(b); *see Carr v. Reno*, 23 F.3d 525, 528 (D.C.Cir.1994) (citing *Southeast-*

---

**9.** This Circuit has held that claims of retaliation are governed by *McDonnell Douglas*, *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C.Cir. 1999), as are cases brought under the Reha-

bilitation Act, *McGill v. Munoz*, 203 F.3d 843, 845 (D.C.Cir.2000), where there is no direct evidence of discrimination.

*ern Community College v. Davis*, 442 U.S. 397, 410–11, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). EEOC regulations interpreting Section 501 require agencies to make reasonable accommodations for persons with a disability unless such accommodations would impose an undue hardship on the agency. 29 C.F.R. § 1614.203(c).

 To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir.2001) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999)); (standard for prima facie case failure to accommodate under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*);[10] *see Breen v. DOT*, 2002 WL 397645, at *2 (D.C.Cir. Mar. 15, 2002) (failure to accommodate occurs when employer does not make reasonable accommodations to otherwise qualified individual with a disability, unless those accommodations would cause undue hardship). To establish a prima facie case of disparate treatment under the Rehabilitation Act, plaintiff must demonstrate that he is (1) a handicapped person within the meaning of the Act, (2) who is qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) has suffered an adverse employment action because of the handicap. *See Duncan v. WMATA*, 240 F.3d 1110, 1114 (D.C.Cir. 2001) (standard for prima facie case of disparate treatment under the ADA).

Analysis of both types of Rehabilitation Act claims begins by determining whether plaintiff is a handicapped person within the meaning of the Rehabilitation Act. Under the Act, "[t]he term 'disability'[11] means ... a physical or mental impairment that substantially limits one or more of the major life activities." 29 U.S.C. § 705(9)(B). Defendant contests that plaintiff is disabled under the Act, arguing that plaintiff was not suffering from a physical or mental impairment during the relevant period, that any disability did not "substantially limit" any "major life activities," and that he cannot establish a record of impairment due to the temporary nature of his medical ailments.

a. "Physical or Mental Impairment"

Defendant first disputes that plaintiff suffered from an impairment under the Rehabilitation Act. Defendant contends that plaintiff's unlimited October 1992 medical clearance, which he maintained at all relevant times, is fatal to his disability claim, particularly because Scarborough refused to comply with the Agency's repeated requests that he submit to a fitness-for-duty examination, as authorized by 3 FAM 672 § 3–2b(5). *See supra* note 3. Defendant also asserts that plaintiff never presented a diagnosis of any disability—and specifically, of CFS—to USAID, and that CFS was not mentioned by any of

---

**10.** Because of the similarity between the ADA and the Rehabilitation Act, "cases interpreting either are applicable and interchangeable." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998).

**11.** The words "disability" and "handicap" are used interchangeably in this Opinion. *See*

*Randon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("The ADA's definition of disability is drawn almost verbatim from the definition of 'handicapped individual' included in the Rehabilitation Act....")

plaintiff's physicians until January 1994. Finally, defendant argues that even plaintiff's experts have conceded that plaintiff's medical submissions to USAID were inconclusive and ambiguous.

The EEOC regulations that implement the Rehabilitation Act define a physical impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; respiratory; genitourinary; hemic and lymphatic; skin; and endocrine ...." [12] 28 C.F.R. § 42.540(k)(2)(i)(A). It is the impairment itself—and not the medical diagnosis of the condition—that determines whether a particular ailment is an impairment under the Act. Arguably, plaintiff has not demonstrated the existence of a physical or mental impairment before 1994.[13] Plaintiff's medical documentation is, at best, sporadic and contradictory. Although plaintiff's documentation from the summer and fall of 1993 does indicate that he intermittently suffered from such maladies as amebiasis, "arthritic pain," (e.g., Def.Ex. 17) and "recurrent diarrhea" (e.g., Def.Ex. 18, at 2), these conditions had essentially disappeared by December 1993. That month, two separate physicians found that plaintiff's arthritis was "under control" and that he was able to fulfill the requirements of his job. (Def.Exs.35–36.)

Nonetheless, given the lack of a requirement that there be a medical diagnosis, the Court will assume without deciding that plaintiff has shown an impairment during the entire relevant period.

b. "Substantially Limits One or More Major Life Activities"

■ Even assuming the existence of an impairment beginning sometime in 1993, plaintiff's Rehabilitation Act claims fail because he cannot show that the impairment substantially limited a major life activity under the Act. The Supreme Court recently noted that the phrases "substantially limits" and "major life activity" both "need to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota, 122 S.Ct. at 691. Under EEOC and HHS regulations, major life activities are "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1614.203(a)(3); 45 C.F.R. § 84.3(j)(2)(ii). Although the Rehabilitation Act regulations do not elaborate on the term "substantially limiting," the regulations implementing the ADA do provide a definition. "Congress drew the ADA's definition of disability almost verbatim from the definition of 'handicapped individual' in the Rehabilitation Act," so it is appropriate to use the definition of "substantially limits" under the ADA to interpret the same phrase

12. The definition of physical impairment in the Department of Health and Human Services ("HHS") regulations implementing the Act is identical to that in the EEOC regulations. See 45 C.F.R. § 84.3(j)(2)(i)(A).

13. For instance, it is apparent that Scarborough suffered from disorders affecting the digestive (see, e.g., Def.Exs. 18–20) and musculoskeletal systems (see, e.g., Def.Exs. 16, 17, 19, 21, 37, 38, 44), and that at least by 1994, Dr. Al–Ibrahim found that while plaintiff's

"physical examination is within normal limits," he suffered from "debilitating fatigue, musculo-skeletal pains, poor sleep, concentrating difficulty, and headaches. In my opinion, the medical picture is consistent with chronic fatigue syndrome." (Def.Ex. 44, at 2.) Nonetheless, even in that letter, the doctor affirmed that plaintiff was not suffering from an impairment prior to that time: "we have an individual previously in fairly good to excellent health...." (Id.)

in the Rehabilitation Act. *Toyota*, 122 S.Ct. at 689. Under that definition,

> substantially limits means (i)[u]nable to perform a major life activity that the average person in the general population can perform, or (ii)[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(1). The Supreme Court has noted that " 'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Toyota*, 122 S.Ct. at 691 (internal citations omitted).

Major life activities "refer to those activities that are of central importance to daily life." *Id.* at 691. Plaintiff alleges that his physical impairment substantially limited his ability to perform two major life activities—walking and working.[14] Scarborough's claim that his impairment substantially limited his ability to walk is unavailing. Plaintiff cites in his Opposi-

tion at page 45 to only one piece of evidentiary support for this claim—the Administrative Law Judge's recitation of plaintiff's testimony at the hearing that he "had a hard time getting out of bed many mornings." (Pl.Ex. 1, at 3.) No reasonable factfinder could infer from this vague piece of evidence that Scarborough was substantially limited in his ability to walk. Although his medical documentation does consistently note that plaintiff felt pain in his legs, there is no basis to argue that his ability to walk was substantially limited.

The Court's analysis of whether plaintiff was substantially limited in his ability to work is guided by the Supreme Court's recent decisions in *Toyota* and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In *Sutton*, the Supreme Court held that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Id.* at 491, 119 S.Ct. 2139. The Court pointed to the EEOC regulations that refine this standard by identifying several factors for courts to consider in determining whether an individual is substantially limited in the major life activity of work-

---

14. At oral argument, plaintiff contended for the first time that his disability substantially limited a third major life activity—sleeping. Although this Circuit has not addressed the issue, other circuits have found that sleeping is a major life activity under the Act, even though it is not named as such in the EEOC regulations. *See Boerst v. General Mills Operations, Inc.*, 2002 WL 59637, at *3, 25 Fed. Appx. 403 (6th Cir.2002); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999). Assuming *arguendo* that sleeping is a major life activity, plaintiff has failed to show that his sleep was "substantially limited." He has offered no evidence about the extent of his sleep troubles, citing only one note from a physician that he experienced "poor sleep"

(Def.Ex.44), and the testimony of his expert that he suffered from "sleep disturbance." (Pl.Ex. 16, ¶ VI (citing to Def.Ex. 44 and to a June 21, 1994 note from Dr. Hochberg that plaintiff "sleeps 14–15 hours").) This is insufficient to survive summary judgment. *See Boerst*, 2002 WL 59637, at *4, 25 Fed.Appx. 403 (ability to get only 2–4 hours of sleep per night is not substantial limitation of major life activity under the Act); *Pack*, 166 F.3d at 1305 (same). Moreover, plaintiff's evidence is inconsistent with respect to his ability to sleep. The May 16, 1994 letter of Dr. Al-Ibrahim notes that plaintiff was not suffering from an inability to sleep, but rather, that he was "severely incapacitated, sleeping 12–14 hours daily." (Def.Ex. 44, at 1.)

ing.[15] These factors include (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the long-term or expected long-term impact of the impairment; (4) the geographical area to which the individual has reasonable access; (5) the job from which the individual was disqualified because of the impairment, and the number of similar jobs from which the individual is also disqualified; and (6) the number of other types of jobs from which the individual is disqualified because of the impairment. 29 C.F.R. §§ 1630.2(j)(2)–(3).

In *Toyota*, the Court affirmed *Sutton* while addressing respondent's claim that she was substantially limited in her ability to perform manual tasks. The Court held:

> When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job. Otherwise, *Sutton's* restriction on claims of disability based on a substantial limitation in working will be rendered meaningless because an inability to perform a specific job always can be recast as an inability to perform a "class" of tasks associated with that specific job.

*Toyota*, 122 S.Ct. at 693. The Court found that "occupation-specific tasks may have only limited relevance to the manual task inquiry"—and, by extension, to an analysis of whether an individual is substantially limited in the major life activity of working. *Id. See Duncan*, 240 F.3d at 1115 ("[T]o establish substantial limitation of working activity under the ADA, a plaintiff must allege and prove that in his particular circumstances, taking into account the appropriate factors, his impairment prevents him from performing a 'substantial class' or 'broad range' of jobs otherwise available to him.").

Applying this framework, it must be concluded that plaintiff has failed to demonstrate that he was substantially limited in his ability to work. Although plaintiff unquestionably exhibited a number of physical symptoms that his doctors ultimately attributed to CFS, he has not produced any evidence to show that this impairment substantially limited his ability to work in a broad class of jobs. The conflicting reports of plaintiff's physicians, including plaintiff's expert, address only generally whether Scarborough was able to fulfill the requirements of his specific job. (*See, e.g.,* Pl.Ex. 15, ¶ 8; Def.Exs. 35–37.) While plaintiff has produced some evidence to show that he was substantially limited in his ability to perform his unique job beginning sometime in 1994, he has offered no support to meet the demanding standard set forth in *Sutton*.[16] Nor has he

---

**15.** In *Sutton*, the Supreme Court assumed, without deciding, that these regulations were reasonable. *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139. In *Toyota*, the Supreme Court expressed skepticism as to whether working can be a major life activity, but did not decide the issue. *Toyota*, 122 S.Ct. at 692 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."). This Court will also proceed on the assumption that working is a major life activity.

**16.** Plaintiff's sole support, recited in his Opposition at page 44, for the assertion that he was unable to fulfill the requirements of his particular job is the statement of his physician that he had "difficulty [ ] performing activities of daily living which require mobility and exercise tolerance." (Pl.Ex.15, ¶ 6.) A lack of mobility and exercise tolerance may have precluded plaintiff from his particular job choice, but still left available "a host of different types of jobs." *Sutton*, 527 U.S. at 492, 119 S.Ct.

provided any evidence to satisfy the EEOC factors, for the record is devoid of documentation about the severity, duration or expected duration, or long-term impact of the impairment, or the number and types of jobs from which he was disqualified because of the impairment. Moreover, plaintiff's claim that defendants should have accommodated him by assigning him to a different position seriously undercuts his argument that his ability to work was substantially limited.

In sum, plaintiff cannot show that he was substantially limited in the major life activity of working—or in any other major life activity—and therefore cannot make out a prima facie case under the Rehabilitation Act. *See Dorn v. Potter*, 190 F.Supp.2d 612, 624 (W.D.Pa.2002) (evidence in record fails to show that plaintiff was substantially limited in any major life activities under *Toyota*). Summary judgment will therefore be granted with regard to plaintiff's Rehabilitation Act claims.[17]

### c. Count I: Reasonable Accommodation

■ Moreover, even assuming *arguendo* that plaintiff could demonstrate the existence of a disability within the meaning of the Act, his failure to accommodate claim (Count I) still cannot not survive summary judgment, because he has not shown that he requested an objectively reasonable accommodation.

■ "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard University*, 198 F.3d 857, 861 (D.C.Cir.1999). Only those requests that are made at the time are protected under the Rehabilitation Act; other requests for accommodation that have been suggested after the fact, by plaintiff's expert or other physicians, are irrelevant to the case.[18]

---

2139. Under *Sutton*, plaintiff is therefore not substantially limited in the activity of working. In fact, Dr. Al–Ibrahim specifically suggested in a July 2000 report that plaintiff was *not* precluded from working in a broad class of jobs: "Where job accommodation is made, affected individuals [such as plaintiff] often remain productive. In severe cases, a total occupational change may be necessary." (Pl. Ex. 23, at 4.) And Dr. Hochberg noted that plaintiff "certainly could have effectively performed at USAID if he had been properly and reasonably accommodated. These accommodations should have included Mr. Scarborough being assigned to a position which was less stressful." (Pl.Ex.15, ¶ 8.) The statements of plaintiff's physicians therefore significantly undercut his claim that he was substantially limited in his ability to work under *Sutton*.

17. The one case that plaintiff cites to support his argument that an individual with CFS is handicapped under the Rehabilitation Act, *Walders v. Garrett*, 765 F.Supp. 303 (E.D.Va. 1991), is inapposite. Although the Court in *Walders* did note that plaintiff's CFS "plainly fits the definition of a handicap," *id.* at 309,

the defendant in that case stipulated that plaintiff was handicapped under the Act, *id.* at 305 n. 4, so the court did not undertake any analysis with regard to that issue. Moreover, *Walders* was decided long before the Supreme Court's opinions in *Sutton* and *Toyota*, which significantly refined the analysis that courts must use in determining whether an individual is disabled under the Act.

18. For example, Dr. Al–Ibrahim's July 2000 report states that "[w]here job accommodation is made, affected individuals [who suffer from CFS] often remain productive." (Pl.Ex. 23, at 4.) Similarly, Dr. Hochberg wrote in June 2000 that plaintiff "should also have been reasonably accommodated by changing his work schedule. Mr. Scarborough was not able to work a full-time schedule at the office. However, he clearly was able to work a regular part-time schedule at the office, a fuller schedule at home, or a fuller shared schedule between the office and home." (Pl.Ex.15, ¶ 9.) These statements are not relevant to the analysis of plaintiff's failure to accommodate claim, because they were written long after

*Id.* at 862. In addition, the Act only applies when a plaintiff's employer has "an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability." *Crandall v. Paralyzed Veterans of America,* 146 F.3d 894, 897 (D.C.Cir.1998). "Reports about which the defendant employer had absolutely no knowledge nor access prior to [acting] cannot serve as the sole evidentiary basis of establishing an element of a prima facie case of disability discrimination." *Weigert v. Georgetown University,* 120 F.Supp.2d 1, 8 (D.D.C. 2000).

Plaintiff asserts that he requested two different accommodations in 1993 and 1994—to be reassigned to another position and to be granted LWOP.[19] As to the first request, the evidence indicates that plaintiff's request for job reassignment was in 1993, when he sought "transfer to a position within the area of my professional experience, expertise, and language capability." (Def.Ex. 3, at 242:10–12.) Plaintiff stated that he first made this request in April 1993, and then again after August of the same year. (Def.Ex. 2, at 94–95.) The record shows that this request was denied in the fall of 1993. (Def.Ex. 15, at 2 (Cashion "understood that [Scarborough] was pursuing a job in the Office of Busi-

ness Development, Bureau for Private Enterprise (PRE). At some point about mid-September or October 1, 1993, I was told that [he] did not get that job.").) There is, however, no evidence that plaintiff had informed defendant that he was seeking reassignment as an accommodation, rather than because he preferred to be transferred to "a position in my area of expertise and training." (Def.Ex. 2, at 93:21–22.) Thus, it is difficult to conclude that defendant was put on notice that the request for a transfer constituted a request for an accommodation. *Flemmings,* 198 F.3d at 861.[20]

Moreover, there is no evidence that plaintiff needed an accommodation in 1993, when his request for reassignment was denied. An October 5, 1993 memo from Cashion to Scarborough indicates that plaintiff had provided no "adequate, acceptable documentation . . . that he is incapacitated by illness." (Def.Ex.28.) In fact, plaintiff's medical records show that he was able to work in his current position. On October 8, 1993, Dr. Hochberg wrote that plaintiff was able to resume regular work, and that there were no permanent effects expected from the reactive arthritis. (Def.Ex.21.) Again, in a December 15 note, Dr. Hochberg wrote that plaintiff "no longer has the arthritis-related disabilities in activities requiring mobility and exercise

---

Scarborough left the agency and propose accommodations that were not suggested while plaintiff was working at USAID.

**19.** Plaintiff also asserts that at some point, he sought to be placed on "medical complement." (Amended Complaint ¶ 43.) As plaintiff conceded at his deposition, however, this request is indistinguishable from the request for LWOP.

Q: [A]re you equating leave without pay with the term medical complement?

A: Yes. But medical complement is long-term leave without pay. I think that would help clarify.

(Def.Ex. 3, at 244:6–9.) Therefore, the analysis of plaintiff's request for LWOP applies also to any supposed request that he made to be placed on medical complement.

**20.** As noted, plaintiff's argument that reassignment could possibly be a reasonable accommodation is also fundamentally inconsistent with the prerequisite contention—that he was disabled because his impairment substantially limited his ability to work in a broad class of jobs.

tolerance and he is able to fulfill his job requirements. There is no reason, medically, why he can no longer work at his chosen occupation." (Def.Ex.35.) (*See also* Def.Ex. 36, Dec. 23, 1993 Doctor's Note ("He can, nonetheless, work at his chosen occupation at this time.").)` Plaintiff has therefore failed to show that he requested reassignment as an accommodation, and even if he did, that he needed an accommodation—or that his employer knew that he needed an accommodation—at that time. Summary judgment is therefore granted with respect to this request.

With respect to plaintiff's contention that he requested LWOP as an accommodation, plaintiff cites to two separate occasions in September 1993 and July 1994. (*See* Pl.Opp. at 6–7.) The only evidence cited by plaintiff of the September 1993 request is a letter from an individual who appears to be plaintiff's union representative to the Office of Human Resources at USAID. Scarborough is not mentioned by name in the letter. The representative writes "to find out ... what other information the member must obtain and submit to the Agency in order to avoid being cited with AWOL in the future, and to possibly convert the past AWOL designation into Leave Without Pay." (Pl.Ex.22.) Even if plaintiff were identified in the letter, no reasonable jury could infer that this document constituted a request that he be placed on LWOP, because the letter is plainly designed only to determine how a USAID employee goes about requesting LWOP status—not as the request itself. Consequently, the Court cannot find that plaintiff requested accommodation in September 1993. Moreover, as previously noted, even if this letter could be construed as a request for an accommodation, there is insufficient evidence that plaintiff was disabled at the time or that defendant knew of any disability.

Plaintiff's sole documented request for accommodation is his July 13, 1994 memorandum to Cashion, in which he requested that he be placed on LWOP "at any time that I am unable to report to work." (Def.Ex.47.) The Rehabilitation Act covers requests for only those accommodations that are "reasonable"; unreasonable accommodations are not protected by the Act. *See, e.g., Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 650 (1st Cir.2000). A court must look to the facts surrounding a request for accommodation to determine whether it is reasonable. *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir.1999). In this case, plaintiff's requested accommodation was unreasonable as a matter of law in two respects. First, plaintiff sought to be placed on LWOP on any given day that he was too sick to attend work; his request was that the Agency grant him LWOP in an erratic, unpredictable manner—whenever plaintiff felt he needed to miss work. Such an accommodation is not reasonable. As this Circuit stated in *Carr v. Reno*, 23 F.3d 525 (D.C.Cir.1994), "[T]o require an employer to accept an open-ended 'work when able' schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions and imperil the effectiveness of the employer's public enterprise." *Id.* at 531 (affirming finding of district court that attendance of employee who was designated AWOL or LWOP for between 200 and 700 hours per year for each of six years "was so erratic as to make her unqualified for *any* position," and transferring her to another agency was therefore not a reasonable accommodation) (emphasis in original); *see Waggoner*, 169 F.3d at 485 (defendant is "not obligated to tolerate erratic, unreliable attendance").

Second, plaintiff requested that the LWOP be granted indefinitely—providing no beginning or end dates—and he

offered no indication that, with treatment, he would be able to resume his normal duties. Such requests for indefinite medical leave are also unreasonable as a matter of law.[21] *Sampson v. Citibank,* 53 F.Supp.2d 13, 18 (D.D.C.1999); *Waggoner,* 169 F.3d at 485; *Hudson v. MCI Telecomms. Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996); *see* 29 C.F.R. pt. 32, App. A(b) (Department of Labor regulations that a reasonable accommodation may require an employer "to grant liberal time off or leave without pay when paid sick leave is exhausted *and when the disability is of a nature that it is likely to respond to treatment or hospitalization*") (emphasis added). This is particularly true where, as here, plaintiff had already missed a significant amount of work prior to his request; had shown no signs of improvement, *Walsh v. UPS,* 201 F.3d 718, 727 (6th Cir.2000); and the medical documentation that he submitted was totally silent on the extent of his disability, his prognosis, or the need for a workplace accommodation.

*Rogers v. CH2M Hill, Inc.,* 18 F.Supp.2d 1328, 1341 (M.D.Ala.1998) ("[I]n the absence of a request for a definite period; and in the absence of any evidence that a definite period available to plaintiff would have cured his problem, the court cannot find that plaintiff has satisfied his burden of requesting a reasonable accommodation....").[22]

In response, plaintiff contends that once he had requested an accommodation, defendant was required to engage in an interactive dialogue to design one that was reasonable. *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1111–12 (9th Cir.2000). The record indicates that defendant did, in fact, do this. In his response to plaintiff's request for LWOP, Cashion explained why he was denying the request, and specifically noted that plaintiff needed to provide beginning and end dates for the proposed LWOP period. At the close of the letter, Cashion invited plaintiff "to submit any other appropriate documents that you believe may be helpful, and I will be happy to

**21.** This case is therefore distinguishable from *Langon,* in which plaintiff, when requesting the accommodation of being permitted to work full-time from home, had described to her supervisors "in considerable detail her current [medical] state, how the tasks of 'dressing, walking, driving, etc. to get to work' had exacerbated her health problems, why she needed to work full time in order to pay her rent and survive, how working at home would enable her to overcome her handicap and perform satisfactorily, and why her job [as a programmer] was of the sort that could be performed at her residence." *Langon,* 959 F.2d at 1055. Plaintiff's request is also significantly different from the one in *Breen,* in which plaintiff proposed a specific "alternative work schedule, pursuant to which she would have worked one hour past normal business hours every day for eight days, in exchange for one day off every two-week pay period—thus maintaining a normal eighty-hour pay period," *Breen,* 282 F.3d 839, 840. The *Breen* court noted that the key difference between the plaintiff there and in *Carr* was that in the latter case, "there was a

critical element of [plaintiff's] position—such as a daily deadline—that rendered the accommodation she proposed ineffectual." *Id.* at 842–43. While the record does not indicate that Scarborough's job was tied to any rigid deadlines, his requested accommodation was still "ineffectual," because it would have allowed him to work only on the infrequent and unpredictable occasions that he felt able, and for an indefinite period. This proposal was nothing like the specific and well-defined accommodations at issue in *Langon* and *Breen,* and thus was not reasonable.

**22.** Even plaintiff's expert acknowledges that the medical records, at least through plaintiff's notice of resignation, lack any specific information as to the extent of plaintiff's disability or the degree of limitations caused by the CFS. (Pl.Ex. 16, at 7.) Moreover, as the expert noted, "[t]he issue of prognosis in not mentioned in the medical records until late 1994"—after plaintiff had already formally submitted his application for retirement. (*Id.* at 9.)

reconsider your request." (Def.Ex.48.) Plaintiff did not respond to Cashion's letter. It is therefore clear that plaintiff, not defendant, failed to engage in the interactive process that he now invokes.

Moreover, plaintiff's repeated failure to attend the three fitness-for-duty exams requested by defendant—on March 1, 1994 (Def.Ex.40), June 1, 1994 (Def.Ex. 46, at 2), and August 26, 1994 (Def.Ex. 49, at 1)—further supports the conclusion that defendant's denial of plaintiff's LWOP request was reasonable. First, it was more than reasonable, as well as permitted by the Agency's regulations, *see supra* note 3, for defendant to reject plaintiff's claim that he was disabled until it conducted its own exam, particularly given plaintiff's maintenance of an unlimited medical clearance as a result of his October 1992 physical. Second, plaintiff's repeated refusal to submit to an examination—despite his explanation that he was too sick to undergo a physical, and would only be examined by a doctor who was trained in diagnosing CFS—constituted a failure to engage in the interactive process. Employees are required to submit to fitness-for-duty exams that are ordered for good cause. *See Risner v. FAA,* 677 F.2d 36, 38 (8th Cir.1982) ("failure to submit to [a fitness-for-duty] examination, when there are good reasons for directing an employee to submit to it, is insubordination and can justify discharge"); *Fuentes v. USPS,* 989 F.Supp. 67, 70 (D.P.R.1997) (employee's failure to submit to fitness-for-duty exam without a just reason "is just cause for disciplinary action"). By the time Scarborough did submit to a fitness-for-duty exam on September 23, 1994, he had already announced his retirement on September 6, effective on September 29, so plaintiff cannot point to this exam to excuse his prior refusals to be examined.

Although this Circuit has cautioned that "it is the unusual Rehabilitation Act case that . . . can be resolved against the plaintiff without extensive fact finding," *Carr,* 23 F.3d at 531, plaintiff here, as in *Carr,* cannot overcome the undisputed evidence that he did not request a reasonable accommodation. For that reason, and because plaintiff has failed to demonstrate that he was disabled within the meaning of the Act, summary judgment will be granted on Count I.

### d. Count II: Forced Retirement

Styled as a claim for disparate treatment because of his disability, plaintiff's forced retirement argument is summarized on page 70 of his Opposition. "Because of Defendant's failure to accommodate Plaintiff's disability, his health deteriorated and he was unable to perform his usual work activities, a condition of his prescriptive relief, which in turn caused him to be forced to retire." As noted, plaintiff cannot establish the existence of a disability or a failure to accommodate. But more importantly, the forced retirement claim collapses with the failure to accommodate claim, and as a matter of law, it cannot exist as a separate Count. *See Langon v. HHS,* 959 F.2d 1053, 1061 (D.C.Cir.1992). Therefore, it must be dismissed.

### e. Count V: Failure To Grant LWOP

Similarly, summary judgment is also granted with regard to plaintiff's claim that the failure to grant LWOP constituted disparate treatment in violation of the Rehabilitation Act. As noted, plaintiff has failed to establish that he was disabled or that defendant failed to accommodate him. Moreover, as explained in *Langon,* 959 F.2d at 1061, plaintiff has presented no direct evidence of bias on defendant's part, and it is illogical to cast this argument as a

disparate treatment claim, as opposed to a failure to accommodate claim.

### f. Counts VIII–XI: 1993–94 EER

As ruled in open court, plaintiff's claims surrounding his 1993–94 EER (Counts VII–XI) cannot survive summary judgment because he has suggested no tangible harm that resulted from the evaluation. *Brown v. Brody*, 199 F.3d 446, 457–58 (D.C.Cir.1999) (poor performance evaluations constitute adverse actions only if they cause objectively tangible harm); *see Russell v. Principi*, 257 F.3d 815, 820 (D.C.Cir.2001) (action that leads only to "unrealized risk of a future adverse action" is not adverse). As a result, the EER does not constitute an adverse action.

### 2. Other Discrimination Claims

As noted, the Court granted summary judgment for defendant at the hearing on plaintiff's other discrimination claims—for violations of Title VII (Counts III and VI) and the ADEA (Counts IV and VII). Plaintiff has offered no evidence that could support an inference of discrimination with regard to claims brought under either statute.

## C. Count XII: Retaliation Claims

Plaintiff's sole remaining claim is that defendant retaliated against him when, in February 1994, Cashion failed to reclassify 158 hours of AWOL time from July–September 1993 to enable plaintiff to obtain worker's compensation for those hours. (*See* Pl.Ex. 12, at 3–4.) [23] In order to establish a prima facie case of retaliation, plaintiff must demonstrate (1) that he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. *Brody*, 199 F.3d at 452.[24]

Plaintiff fulfills the first prong of the three-part test for a prima facie case because he engaged in protected activity on two separate occasions—in November 1990, when he contacted the EEOC in Jakarta about his dispute with Navin, and

---

**23.** Plaintiff also alleges in ¶ 99 of Count XII that Cashion retaliated against him by not informing the OWCP of the recurrence of his disability. This appears to be indistinguishable from his claim that Cashion did not reclassify the 158 hours. If it is not the same, there is no basis for arguing that this resulted in any adverse consequence, since it is uncontested that plaintiff did receive worker's compensation for the period October 1, 1992 through October 1, 1993, with the exception of the 158 hours.

**24.** As noted, summary judgment was granted at oral argument with regard to plaintiff's other retaliation claims in Count XII. Plaintiff's claim that defendant retaliated against him by refusing to authorize a buy-back of his sick leave fails because it is undisputed that Joan King, the individual at OWCP who processed plaintiff's worker's compensation claims and failed to authorize the entire buy-back, did not become aware that plaintiff had engaged in any protected activity until March 1996—more than a year after she had handled his claim. (Def.Ex. 3, at 210:17–211:21; Def.Ex. 60, at 6.) *See Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985); *Jones v. Billington*, 12 F.Supp.2d 1, 14 (D.D.C.1997). Plaintiff's contention that Navin retaliated against him in February 1994 by failing to process his worker's compensation claims cannot survive summary judgment because plaintiff cannot establish a causal connection between the protected activity related to Navin—which occurred in 1990—and Navin's alleged actions (for which plaintiff offers no evidence) in February 1994. *See Garrett v. Lujan*, 799 F.Supp. 198, 202 (D.D.C.1992) (one year too long to infer causal connection); *Parrott v. Cheney*, 748 F.Supp. 312 (D.Md.1989) (four months too long); *see also Devera v. Adams*, 874 F.Supp. 17 (D.D.C.1995) (eight months generally too long). Moreover, plaintiff conceded at oral argument that no adverse consequence resulted from the delay in processing his worker's compensation claim, since he was in fact awarded worker's compensation.

in February 1994, when he contacted the EEOC about the claims at issue here.

However, plaintiff has failed to establish that defendant took an adverse employment action against him in 1994 by failing to reclassify the 158 hours. As a preliminary matter, the premise of plaintiff's claim is faulty: Cashion classified the 158 hours as AWOL during the July–September 1993 timeframe (*see* Pl.Ex. 12, at 3–4), prior to plaintiff's engaging in any protected activity that could be causally related to Cashion's decision. Second, there is no basis for plaintiff to argue that this classification was in error given the lack of adequate documentation to substantiate the granting of LWOP, as opposed to treating plaintiff's absences as AWOL. Third, plaintiff has provided no evidence that Cashion was asked to reconsider these hours in February 1994, or that he considered the issue at that time.[25] Summary judgment is therefore granted with respect to Count XII.

### CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment is granted. A separate Order accompanies this Opinion.

### *ORDER*

Based on consideration of defendant's motion to dismiss or for summary judgment, plaintiff's opposition, and the entire record contained therein, and for the reasons stated in the accompanying Memorandum Opinion and in open court on March 7 and 8, it is hereby:

**ORDERED** that the motion to dismiss [42–1] is **DENIED;** and it is

**FURTHER ORDERED** that the motion for summary judgment [42–2] is **GRANTED;** and it is

**FURTHER ORDERED** that the complaint is dismissed with prejudice.

This is a final appealable order.

**SO ORDERED.**

---

**25.** At oral argument, the Court asked for clarification of this claim, including any relevant documentation, specification as to dates, and an itemization of any benefits or monies that were lost as a result of Cashion's action. Plaintiff's counsel could provide little by way of explanation, which may explain why defendant treated this claim in its brief as indistinguishable from plaintiff's buy-back of sick leave claim. Moreover, given plaintiff's inability to specify when in February 1994 this event supposedly occurred, it cannot be said that it followed his seeking EEOC counseling on February 17, 1994 (Amended Complaint ¶ 96), which is the relevant protected activity. Thus, there is a serious question as to whether it could be viewed as causally related to plaintiff's protected activity. In addition, in response to the request for explanatory documentation, plaintiff's counsel provided Exhibits 28 and 29, which relate to Navin, not Cashion, and are dated February 2 and 5, 1994—before the protected activity in question. Finally, Plaintiff's Opposition at page 77, which is the only place where this claim is addressed, provides absolutely no explanation or support for the claim except to say that summary judgment should be denied because Cashion's credibility is at issue.