**Rosemarie CARR, Appellant,**

v.

**Janet RENO, Attorney General.**

**No. 92–5115, et al.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1994.

Decided May 20, 1994.

Amy E. Wind, Washington, DC, argued the cause and filed the briefs for appellant.

Irving Kator, Washington, DC, entered an appearance.

Howard S. Scher, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellee. Also appearing on the brief were Eric H. Holder, Jr., U.S. Atty., and Robert V. Zenar, Atty., U.S. Dept. of Justice, Washington, DC.

Before: MIKVA, Chief Judge, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Rosemarie Carr was discharged from her position as Coding Clerk at the United States Attorney's Office because an ear condition frequently caused her to be absent from work for prolonged periods of time without warning, and because she failed to explain or report her absences. She sued under the Rehabilitation Act of 1973 and the Civil Service Reform Act, claiming that handicap discrimination motivated her discharge. The Merit Systems Protection Board and the district court disagreed, the latter entering summary judgment for the defendant, the Attorney General. Ms. Carr appeals, and we affirm.

## I. Background

In 1975, Rosemarie Carr underwent surgery that left her with an ear disability, diagnosed as Meniere's Disease or another form of endolymphatic hydrops. The disease causes periodic dizziness, nausea, and vomiting, usually in the early morning and upon travelling. In 1980, the Department of Justice hired Ms. Carr pursuant to a special program for the disabled. She worked on a flexible schedule as a GS–3 data transcriber at the Immigration and Naturalization Service ("INS"). Her work was satisfactory, and two years later she became a permanent government employee. In 1984, she won competitive selection to a GS–5 Coding Clerk position at the United States Attorney's Office in the District of Columbia ("U.S. Attorney's Office" or "Office").

The U.S. Attorney's Office expected Ms. Carr to keep regular hours of 9:00 to 5:30 every working day. She could not. In the early morning, and when riding to work on public transportation, she frequently succumbed to dizziness and nausea, forcing her to miss work. Worse, Ms. Carr was frequently unable to call the Office to inform her superiors that she could not work—both because she could not anticipate the spells in advance and because, having occurred, they made her too sick to call in. The Office sought to accommodate Ms. Carr's condition by placing a sofa in a nearby office for her use during workday attacks and by permitting her to report to the health unit whenever necessary, but her poor attendance persisted. Indeed, her absences sometimes stretched for months. As a result, Ms. Carr was absent for a total of 477 hours in her first seven months of work alone (a combination of Leave Without Pay ("LWOP") (357 hours), annual leave (72 hours), and sick leave (48 hours)). Her yearly totals of LWOP and Absent Without Leave ("AWOL") time were 521.5 in 1984, 433 in 1985, 651 in 1986, 212.5 in 1987, 413.7 in 1988, and 462.9 in 1989.

Ms. Carr's attendance record proved sorely troublesome to the U.S. Attorney's Office. The Office relies on its two Coding Clerks to code papers relating to recent arrests in the District of Columbia. These papers are picked up daily at 4:00 p.m. for input into a computerized database. If the Office falls behind in this process, it must expend considerable resources to catch up. When Ms. Carr, without advance warning or prompt explanation, did not show up for work, the Office was forced to rely on a single clerk because it could not know when a replacement (assuming one could be found) would be needed.

Ms. Carr maintains that many of her AWOL hours occurred because the Office required her to obtain a doctor's note each time she was absent from work. According to Ms. Carr, she could not obtain such a note without waiting in line at her HMO for several hours; as a result, she often failed to provide such documentation. Ms. Carr also argues that she was subjected to different

treatment than other employees: being considered AWOL when she forgot to sign in, and having to inform her supervisor of her whereabouts at all times. The Office responds that Ms. Carr's poor attendance record necessitated these restrictions.

In October 1984, the Office requested that Ms. Carr submit information about her medical condition. She responded with a doctor's note stating that she suffers from Meniere's Disease and that she is on medication that is usually effective. Despite repeated requests, Ms. Carr failed to produce anything more detailed. After one absence of over a month without a doctor's note, Ms. Carr was suspended for five days. A subsequent absence lasted for five months. Ms. Carr argues that this latter absence occurred because the Office effectively told her not to return to work until she submitted a detailed doctor's report. But the agency responds—and Ms. Carr does not expressly disagree—that this ultimatum was issued a month after she went AWOL.

In April 1986, because of short staffing, the agency allowed Ms. Carr to work on her own schedule—she could come and go at will. She received an "outstanding" performance rating for that period, but she was nonetheless unable to put in an eight-hour day. Eventually, after another dispute about a doctor's examination, and in light of Ms. Carr's continued poor attendance, the Office discharged her in March 1990.

Ms. Carr brought handicap discrimination charges before the Merit Systems Protection Board ("MSPB") under the Rehabilitation Act of 1973 and the Civil Service Reform Act. An MSPB Administrative Law Judge upheld her firing on July 20, 1990, holding that Ms. Carr was not a "qualified handicapped person" within the meaning of the Rehabilitation Act, and that her suggested accommodation—an open-ended schedule—was unreasonable and would inflict an "undue burden" on the U.S. Attorney's Office. After the MSPB decision became final, Ms. Carr petitioned for review with the Equal Employment Opportunity Commission ("EEOC"), which concurred with the MSPB's decision. Having thus exhausted her administrative remedies, Ms. Carr then sued in the district court. On February 5, 1992, the court granted summary judgment for the U.S. Attorney's Office.

## II. Discussion

Ms. Carr challenges her dismissal under both the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794 ("Rehabilitation Act" or "Act"), and the Civil Service Reform Act, 5 U.S.C. § 7511 *et seq.* We review de novo the MSPB's findings under the Rehabilitation Act, but we review its findings under the Civil Service Reform Act on the administrative record under an arbitrary and capricious standard. *Barnes v. Small,* 840 F.2d 972, 979 (D.C.Cir.1988). As the district court disposed of this case on summary judgment, we look at all facts in the light most favorable to Ms. Carr and we uphold the summary judgment only if there is no genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### A. Rehabilitation Act

Section 504 of the Rehabilitation Act applies to all federally funded activities. It provides, "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity...." 29 U.S.C. § 794(a). Section 501 of the Act applies specifically to federal employers; it requires them to take *affirmative action* on behalf of the disabled, an obligation that goes beyond the non-discrimination requirement in § 504. 29 U.S.C. § 791(b). *See Southeastern Community College v. Davis,* 442 U.S. 397, 410–11, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

Pursuant to section 501, EEOC regulations define the duties of federal employers toward the disabled. 29 C.F.R. § 1614.203 (replacing substantially similar 29 C.F.R. 1613.701 *et seq.,* in October 1992). These regulations declare that "[t]he Federal Government shall become a model employer of individuals with handicaps." 29 C.F.R. § 1614.203(b). Specifically, the "model employer" standard requires that:

(1) An agency shall make *reasonable accommodation* to the known physical or mental limitations of an applicant or employee who is a *qualified individual with handicaps* unless the agency can demonstrate that the accommodation would impose an *undue hardship* on the operations of its program.

(2) Reasonable accommodation may include, but shall not be limited to: (i) Making facilities readily accessible to and usable by individuals with handicaps; and (ii) Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

29 C.F.R § 1614.203(c) (emphasis added).

█ The essential dispute in this case is whether Ms. Carr is a "qualified individual with handicaps" (formerly, "qualified handicapped person"). Under the regulations, a "qualified individual with handicaps" is "an individual with handicaps who, *with or without reasonable accommodation,* can perform the essential functions of the position in question without endangering the health and safety of the individual .or others...." 29 C.F.R. § 1614.203(a)(6) (emphasis added). Both parties interpret the "with or without reasonable accommodation" language to mean *either* with accommodation or without it: that is, an individual with handicaps is "qualified" if she can perform the essential functions of her position with reasonable accommodation. If she can perform these functions *without* reasonable accommodation, so much the better—she is, of course, still qualified. We agree with this interpretation.

█ Ms. Carr argues that, with reasonable accommodation, she could perform all the essential functions of a Coding Clerk. The Office responds that regular attendance is an essential function and that any accommodation that allowed for lengthy absences without warning or early notice would pose an undue hardship on the workings of the Office. To resolve this dispute, the district court proceeded to consider two apparently separate questions: (1) whether Ms. Carr was a "qualified individual with handicaps"; and (2) whether her handicap could have been accommodated without undue hardship. But these questions are interrelated. Recall that a "qualified individual with handicaps" is someone "who, *with ·or without reasonable accommodation,* can perform the essential functions of the position"—and we have interpreted the crucial language to mean *either* with or without accommodation. Ms. Carr concedes that without some form of accommodation she cannot perform the essential functions of her job. Under these circumstances, the regulation requires us to ask simply whether any reasonable accommodation would have allowed Ms. Carr to perform all the essential functions of her job without creating an undue hardship for the agency. *See Hall v. United States Postal Service,* 857 F.2d 1073, 1078 (6th Cir.1988).

Ms. Carr asked for the following accommodation: a flexible arrival time (between 8:00 a.m. and noon); release from the requirement of continually providing doctors' reports; and job restructuring to ensure that the time-sensitive portions of her job were taken care of when she was unable to attend. But· the district court considered this an unsatisfactory solution. Because of Ms. Carr's erratic (at best) attendance record and her inability to inform. the Office when she could not attend, the court found that the U.S. Attorney's Office could not function normally without having others do her work on a daily basis. The U.S. Attorney's Office has demonstrated that its 4:00 p.m. deadline renders a flexible schedule an undue hardship. Its chosen accommodation, to allow Ms. Carr as-needed access to· the health unit and to a sofa in a nearby office, did not result in improved attendance. As for giving Ms. Carr a flexible schedule, the court noted, even for the short period in 1986 when this was tried Ms. Carr could not work a full eight-hour day. With or without reasonable accommodation, then, she could not perform the "essential function" of coming to work regularly. *Cf. Matzo v. Postmaster General,* 685 F.Supp. 260, 263 (D.D.C.1987), *aff'd without opinion,* 861 F.2d 1290 (D.C.Cir.1988) (regular attendance is an essential function.).

We are reminded that section 501 demands a great deal from federal employers in the way of accommodation. Indeed, in appropriate cases, that section requires an agency to consider work at home, as well as reassignment in another position, as potential forms of accommodation. *See Langon v. HHS,* 959 F.2d 1053 (D.C.Cir.1992) (holding that an agency must consider accommodating a computer programmer with multiple sclerosis by allowing her to work at home). But under the facts of this case the U.S. Attorney's Office properly rejected these options. Ms. Carr concedes that she could not work as a Coding Clerk at home, as the job involves tight 4:00 p.m. deadlines. Even if a job could be found for her that allowed her to work at home, there is no reason to think her periodic dizziness and nausea would allow her to work regular hours on a consistent basis.

Although reassignment in another job may be one form of reasonable accommodation, *see Rhone v. United States Department of Army,* 665 F.Supp. 734, 744 (E.D.Mo.1987), and the regulations specifically provide that "job restructuring" or "part-time or modified work schedules" should be considered, 29 C.F.R. § 1614.203(b)(2), the district court held that Ms. Carr's attendance was so erratic as to make her unqualified for *any* position. We agree with the proposition that an essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time. Ms. Carr's record demonstrates that the Office could not count on her to fulfill these minimum expectations. If it is unreasonable to ask the Office to continue to put up with Ms. Carr's poor attendance, it is equally unreasonable to require the Office to refer an unqualified employee to another government agency for employment.

Finally, we must address Ms. Carr's contention that the district court should have conducted an "individualized inquiry" into possible forms of reasonable accommodation. *See School Bd. of Nassau County, Florida v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1130, 94 L.Ed.2d 307 (1987) ("[I]n most cases, the district court will need to conduct an individualized inquiry and make appropriate findings of fact."). Once the district court determined that Ms. Carr could not perform an essential function of any government job, we think there was no need for further fact finding. The "individualized inquiry" need be no more extensive than the facts of the case demand. Any other holding would require a district court to engage in a pro forma wild goose chase every time a plaintiff invokes the Rehabilitation Act.

In short, we think the district court was correct to hold that there is no genuine issue of fact as to whether Ms. Carr was a "qualified individual with handicaps." With or without reasonable accommodation, Ms. Carr's performance since 1984 showed that she would not be able to work regular hours. Accordingly, the Department of Justice was not obligated to retain her.

**B. Civil Service Reform Act**

■ Ms. Carr also brought suit under the Civil Service Reform Act, 5 U.S.C. § 7511 *et seq.,* claiming that an agency may not take adverse action against an employee for conduct caused by a medical condition. We may consider only the administrative record, and we may reverse only if the MSPB's decision was arbitrary, capricious, or an abuse of discretion.

■ We find that the MSPB's decision was reasonable. The Office dismissed Ms. Carr because of her absences, not because of handicap discrimination. Even though Ms. Carr's handicap was the reason for her absences from work, these absences were real and they were detrimental to "the efficiency of the service." 5 U.S.C. § 7513(a). *See Barnes v. Small,* 840 F.2d 972, 979–80 (D.C.Cir.1988). Given our finding that the discharge was justified under the Rehabilitation Act, we cannot upset the MSPB's holding that Ms. Carr's firing was based on her detrimental conduct, and not on impermissible handicap discrimination.

**III. Conclusion**

The district court correctly held that Ms. Carr's prolonged, frequent, and unpredictable absences render her unqualified for any

government job. Accordingly, we affirm the entry of summary judgment against her. We acknowledge that it is the unusual Rehabilitation Act case that, like this one, can be resolved against the plaintiff without extensive fact finding. In section 501, Congress has placed a heavy burden on government employers to accommodate the needs of individuals with handicaps. This statute represents an important public policy goal, and we do not take lightly our role in enforcing its dictates. But to require an employer to accept an open-ended "work when able" schedule for a time-sensitive job would stretch "reasonable accommodation" to absurd proportions and imperil the effectiveness of the employer's public enterprise. We find that the facts of this case compel summary judgment, and the district court's opinion is therefore

*Affirmed.*