Linda SOLOMON, Plaintiff,

v.

Thomas J. VILSACK, U.S. Secretary of Agriculture,[1] Defendant.

Civil Action No. 07–1590(JDB).

United States District Court, District of Columbia.

Feb. 23, 2012.

1. Former U.S. Secretary of Agriculture Mike Johanns was named as the original defendant in this case. Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes his successor, Secretary Thomas J. Vilsack, as the new defendant.

John F. Karl, Jr., McDonald & Karl, Washington, DC, for Plaintiff.

Harry B. Roback, U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION

JOHN D. BATES, District Judge.

Plaintiff Linda Solomon, a former employee of the United States Department of Agriculture, brings this employment discrimination and retaliation action against the Secretary of Agriculture, Thomas J. Vilsack. Solomon alleges that the Secretary violated the Rehabilitation Act of 1973 by unlawfully denying her accommodations for her disability. Solomon also alleges that the Secretary violated the Civil Rights Act of 1964 by denying her the accommodations as an act of retaliation. The Court previously awarded summary judgment to the Secretary on all of Solomon's claims, concluding that they are precluded by Solomon's application for and receipt of federal employee retirement disability benefits. That decision was vacated and remanded by the U.S. Court of Appeals for the District of Columbia Circuit.

Now before the Court is the Secretary's renewed motion for summary judgment on other grounds. The Secretary argues that the accommodations Solomon sought were unreasonable as a matter of law and that therefore the Secretary violated neither the Rehabilitation Act nor the Civil Rights Act. For the reasons described below, the Court will grant the Secretary's motion.

## I. *Background*

Solomon began working as a budget analyst at the United States Department of Agriculture ("USDA") in 1997. *See* Pl.'s SOF ¶ 20.[2] She has a long history of depression and has been treated by mental health professionals, including Dr. Dennis Cozzens, a psychiatrist. *See* Pl.'s SOF ¶¶ 1–2. Solomon's depression intensified in late 2003 because of various personal hardships she experienced at that time. *See* Def.'s SOF ¶¶ 12–24. Her mental health in late 2003 into 2004 "was on occasion unpredictable" and she had problems sleeping, concentrating, and focusing. Pl.'s SOF at 2, She began suffering from "panic disorder" and "agoraphobia." [3]

As her depression worsened, Solomon began missing work. In the first ten weeks of 2004, she used more than 110 hours of leave, including 50 hours of leave without pay. *See* Def.'s SOF ¶ 84. By early March 2004, Solomon began communicating with her supervisors about her condition and requested certain accommodations, described in detail below. *See* PL's SOF ¶¶ 40, 62–71. On March 24, 2004, Cozzens confirmed to USDA that Solomon was under his care and requested a "flexible work schedule" for Solomon. *See* Pl.'s SOF ¶ 42. Solomon's supervisors denied her requests for accommodations in April 2004, and, after a confrontation with her supervisors on April 23, 2004 regarding her work schedule, Solomon stopped coming to work. *See* Pl.'s SOF ¶¶ 73–78.

Dr. Cozzens sent several letters to the USDA about Solomon after she stopped working. Cozzens believed that Solomon had entered a downward cycle by May 2004. *See* Def.'s SOF ¶¶ 39–41; Pl.'s SOF ¶ 88. On May 10, 2004, he wrote that Solomon's condition had "prevented her from attending work." *See* Def.'s SOF ¶ 88. [redacted] *See* Def.'s SOF ¶¶ 42–46. Cozzens wrote to USDA on June 2, 2004, informing the agency about [redacted], reporting that she remained unable to work, and estimating that she would be able to return to work in mid-July. *See* Def.'s SOF ¶¶ 90–91; Pl.'s SOF ¶ 89. At the same time, Solomon continued to communicate with her supervisors from home regarding her schedule and leave. *See* Pl.'s SOF ¶¶ 94–95, 197.

By mid-July 2004, Solomon wrote to Cozzens that she had "decided to go for[ward] with the permanent disability package." *See* Def.'s SOF ¶ 102. Solomon describes herself as having been in "crisis" in July 2004. *See* Def.'s SOF ¶¶ 47, 53. Her condition had not improved by August 2004. *See* Def.'s SOF ¶¶ 55–58. Solomon and Cozzens completed the documentation required for Federal Employees Retirement System (FERS) disability benefits and submitted the forms on August 30, 2004. *See* Def.'s SOF ¶¶ 103–06.

Solomon's application for FERS benefits was approved in December 2004. Def.'s SOF ¶ 110. She began receiving benefits (retroactive to the date of application) in January 2005 of approximately $1,400 per month. *See* Solomon Dep. at 43:18–44:8, 46:3–19. Since then, Solomon has continued to represent that she cannot return to work because of her disability. *See* Solomon Dep. Def.'s Ex. 18 at 26 (letter of Dr.

---

**2.** Pursuant to Local Rule 7(h), each party submitted a statement of facts ("Pl.'s SOF" and "Def.'s SOF") as part of their briefing on the Secretary's renewed motion for summary judgment. Portions of depositions of various individuals were included with the statements of facts. The Secretary included exhibits to accompany the depositions, and Solomon included an appendix of exhibits with her statement of facts.

**3.** Agoraphobia is an anxiety disorder characterized by the fear of being around other people.

Cozzens stating that "Ms. Solomon is still disabled . . . and cannot return to her former employment because of this disability") (dated Dec. 5, 2007).

In September 2007, Solomon filed the present complaint seeking relief under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[4] The Secretary filed a motion for summary judgment in February 2009 arguing, among other things, that Solomon's present claims were precluded by her application and receipt of FERS benefits. The Court granted summary judgment on that ground, concluding that Solomon is only eligible for FERS "because her disability cannot reasonably be accommodated." *Solomon v. Vilsack*, 656 F.Supp.2d at 63.

On appeal, the D.C. Circuit vacated and remanded, holding that Solomon's "receipt of disability benefits bars neither her claim that her employer failed to accommodate her disability nor a related set of claims that her supervisors retaliated against her for exercising her rights under federal antidiscrimination laws." *Solomon v. Vilsack*, 628 F.3d at 557. The court declined to consider the Secretary's alternative ground for summary judgment, that "no reasonable accommodation would have enabled Solomon to perform the essential functions of her position and that her supervisors did not retaliate against her for engaging in statutorily protected activities," remanding "for the district court to consider this issue in the first instance." *Id.* at 568. Now before the Court is the Secretary's renewed motion for summary judgment on that ground.

II. *Summary Judgment Standard*

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *see Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Summary judgment is appropriate if the

---

4. Solomon's complaint also made a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* *See* Compl. ¶¶ 26–27. But the Court previously dismissed this claim, *see Solomon v. Vilsack*, 656 F.Supp.2d 55, 62–63 (D.D.C.2009), and Solomon did not pursue the claim on appeal, *see Solomon v. Vilsack*, 628 F.3d 555, 560 (D.C.Cir.2010).

non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

### III. *Rehabilitation Act Claim*

Solomon alleges that the Secretary violated the Rehabilitation Act by refusing to accommodate her disability, thereby forcing her into retirement. The Secretary now argues that USDA did not have an obligation to grant Solomon's request for accommodations because the accommodations Solomon sought were unreasonable as a matter of law.

### a. *Legal Standard*

■ The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). *See generally Breen v. DOT,* 282 F.3d 839, 841 (D.C.Cir.2002). The Act states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [certain provisions of] the Americans with Disabilities Act." 29 U.S.C. § 794(d). The ADA bars discrimination against a "qualified individual with a disability," defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* §§ 12112(a), 12111(8). Accordingly, an individual with a disability is "qualified" if he or she can perform the essential functions of the position with a reasonable accommodation. *Carr v. Reno,* 23 F.3d 525, 529 (D.C.Cir. 1994).

■ The ADA defines the term "discriminate" to include "not making reason-able accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless ... the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA further defines the term "reasonable accommodation" to include "job restructuring [and] part-time or modified work schedules." *Id.* § 12111(9); *see* 29 C.F.R. § 1614.203(c)(2). Furthermore, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation [that] the defendant-employer has denied." *Flemmings v. Howard Univ.,* 198 F.3d 857, 861 (D.C.Cir.1999).

■ Although the ADA defines "reasonable accommodation" to include "modified work schedules," 42 U.S.C. § 12111(9), case law from this circuit makes clear that "to require an employer to accept an open-ended 'work when able' schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions and imperil the effectiveness of the employer's public enterprise." *Carr,* 23 F.3d at 531. Hence, a judge of this district has concluded that a plaintiff's request "to be placed on [Leave Without Pay] on any given day that he was too sick to attend work" was unreasonable as a matter of law. *Scarborough v. Natsios,* 190 F.Supp.2d 5, 25 (D.D.C.2002). On the other hand, the D.C. Circuit has concluded that it was not unreasonable as a matter of law for an employee to request working from home as an accommodation in her job as a computer programmer. *Langon v. Dept. of Health and Human Services,* 959 F.2d 1053, 1061 (D.C.Cir.1992) ("[B]ecause there are genuine factual disputes ... about whether letting [plaintiff] work at home would have imposed an undue hardship upon [the agency], summary judg-

ment should not have been granted."). Likewise, the court in *Breen* found that there was a genuine issue of material fact as to whether a modified work schedule in which plaintiff worked an extra hour each day for eight days, with a compensating day off every two weeks, was a reasonable accommodation. 282 F.3d at 842. The court noted in particular that "the plaintiff has not conceded that there was a critical element of her position—such as a daily deadline—that rendered the accommodation she proposed ineffectual." *Id.* at 843. Characterizing the two lines of cases, Scarborough distinguished an unreasonable accommodation that "would have allowed [the plaintiff] to work only on the infrequent and unpredictable occasions that he felt able, and for an indefinite period" from "the specific and well-defined accommodations at issue in *Langon* and *Breen.*" 190 F.Supp.2d at 26 n. 21.

#### b. *Parties' Submissions and Factual Record*

Solomon alleges that the Secretary violated the Rehabilitation Act by "refus[ing] to accommodate Solomon by providing reasonable accommodation for her disability and denying her advanced sick leave; and forcing Solomon to file for disability retirement." Compl. ¶ 25. As the D.C. Circuit succinctly stated, "to prevail on her accommodation claim, Solomon must show that she could have performed the essential functions of her job as a budget analyst with reasonable accommodation." 628 F.3d at 560.

The Secretary argues that the accommodations requested by Solomon were "unreasonable as a matter of law" because she "sought a schedule that would allow her to work only when her depression allowed" and "such a 'work when able' schedule is not reasonable." Mem. in Supp. of Def.'s Renewed Mot. for Summ. J. [Docket En-

try 70] ("Def.'s Mem.") at 2. Solomon responds that "the evidence of record shows that accommodations in place early in 2004 did, in fact, allow her to work and that further accommodations would have succeeded." Pl.'s Opp'n to Def.'s Renewed Mot. for Summ. J. [Docket Entry 75] ("Pl.'s Opp'n") at 1. Solomon objects to the Secretary's claim "that Solomon sought a schedule that allow[ed] her 'to work only on those days and only those hours she felt able,'" arguing instead that "[w]hat Solomon most wanted was a flexible schedule that would have paid her for the work she did after 6 p.m. so she could have come in late on the days when she had bad mornings or worked late to make up time when she left early one day because she had a bad afternoon." *Id.* at 19–20.

With respect to the accommodations requested by Solomon, the parties have each filed lengthy statements of material facts accompanied by extensive exhibits and deposition testimony. Since the request for accommodations is the heart of Solomon's claim under the Rehabilitation Act, the Court will recount Solomon's interactions with the USDA regarding accommodations in some detail, roughly chronologically.

Solomon's ordinary working schedule was 7:30 a.m. to 6 p.m., four days a week, with Wednesdays off, *See* Pl.'s SOF ¶ 29. In "late 2003," Solomon began regularly missing time from her ordinary schedule. *See* Pl.'s SOF ¶ 31. In an email exchange in January 2004, Solomon notified her "first-line supervisor," Sylvia Booth, that "it is [her] understanding that some of your staff is allowed to work flex-time without recording the time accordingly" and "request[ed] to work flex-time as well." *See* Pl.'s SOF ¶ 61; Pl.'s Exs. at 1747. Booth rejected this request. Instead, in the first ten weeks of 2004, Solomon used more than 110 hours of leave: 35.25 hours of annual leave, 23.5 hours of

sick leave, 5.25 hours of compensatory leave, and 50 hours of leave without pay. *See* Def.'s SOF ¶ 84. Booth approved Solomon's bi-weekly timecards during this period. *See* Pl.'s SOF ¶ 36. Solomon maintains that she "met her deadlines and did her work" during this period by "working extra to make up for the hours she missed." *id.* "Some days she would be at work at 5 a.m. and other days stay as late as 10 to 11 p.m.," and she would also take work home to complete if she had a deadline to meet. *See* Pl.'s SOF ¶ 33. According to Solomon, a co-worker similarly often arrived late and worked until at least 8 p.m. *See* Pl.'s SOF ¶ 34.

On March 2, 2004, Solomon sent an e-mail to Booth in which she apologized "for [her] erratic leave lately," disclosed her depression, stated that she was "just taking it day by day," and offered to provide medical documentation. *See* Def.'s SOF ¶ 72; Pl.'s SOF ¶ 40. In an e-mail response, Booth said: "If your medical condition is going to impact your normal duty schedule, and you think you'll need special accommodations, I recommend providing medical documentation. This will cover any questions on excessive use of leave, etc." *See* Def.'s SOF ¶ 73; Pl.'s SOF ¶ 41. On March 24, 2004, Dr. Cozzens (Solomon's psychiatrist) wrote a letter to the USDA indicating that Solomon was under his care for chronic depression, anxiety, and insomnia and requesting that Solomon be provided a "flexible work schedule." *See* Def.'s SOF ¶ 74; Pl.'s SOF ¶ 42.

During this time period, Solomon also requested other accommodations. Booth granted Solomon permission to hang a curtain across her cubicle "to cut down on noise and prevent people walking in to chat … so she could better focus and concentrate." *See* Pl.'s SOF ¶¶ 37–38. Solomon also requested relocation of her cubicle work space away from its current location in a "high traffic area." *See* Pl.'s SOF ¶ 62. On March 29, Solomon asked Booth permission to "work credit hours-maxiflex." *See* Pl.'s SOF ¶ 71, According to the deposition testimony of another USDA official, "maxiflex" is a program elsewhere within the federal government in which an employee "can work different hours on different days, if you have the approval of your supervisor." Theresa Arlene Christian Dep. at 99:11–100:17. Solomon now states that in the maxiflex arrangement, "employees can work 10 hours today, six hours tomorrow, five hours the next day, as long as they make their 40 hours [per week]." Pl.'s SOF ¶ 111.

On April 6, 2004, Solomon's "second-line supervisor," Deborah Lawrence, sent Solomon a memorandum requesting "supporting medical documentation" from her psychiatrist of her condition. *See* Def.'s SOF ¶ 83; Solomon Dep. Def.'s Ex. 11; Pl.'s SOF ¶ 73. The memorandum also noted Solomon's substantial leave and expressed concern about "[Solomon's] welfare and the accomplishment of the duties, which you have been assigned." *See* Def.'s SOF ¶ 84. The memorandum further stated that Solomon must remove the cubicle curtain because it "presents a situation that could cause harm to yourself and others." Solomon Dep. Def.'s Ex. 11; Pl.'s SOF ¶ 74. The memorandum did not address relocation of Solomon's cubicle, and Lawrence wrote a memorandum to another USDA official requesting that Solomon's cubicle be relocated. *See* Pl.'s Exs. at 1213. Solomon now indicates that this request was never approved nor denied. *See* Pl.'s SOF ¶¶ 70, 79. On April 22, Solomon responded to Lawrence with a faxed memorandum indicating that she had "removed the curtain rod installation" and was in contact with her doctor about providing documentation. *See* Pl.'s Exs. at 1365; Def.'s SOF ¶ 85.

On April 23, Solomon arrived late to work because she was not feeling well. *See* Pl.'s SOF ¶ 75. Solomon informed another supervisor that "because she started late she would be working late to complete a project, but she was not requesting to be compensated for that time." *See* Pl.'s SOF ¶ 75. Later that day, Solomon was informed that she would not be permitted to work past 6 p.m. *See* Pl.'s SOF ¶ 76. The refusal "sent [her] over the edge" and she left work and never returned. *See* Pl.'s SOF ¶ 78.

On April 27, Solomon faxed a letter to Cozzens indicating, among other things, that disability retirement might be her best option. *See* Pl.'s SOF ¶¶ 96–98. Also on April 27, Solomon communicated with a different supervisor at USDA, William French, stating that she could not presently return to work and complaining about not being allowed to work past her normal departure time. *See* Pl.'s SOF ¶¶ 103–104. On May 3, French told Solomon that she could no longer work past 6 p.m. without approval and suggested that Solomon would be considered "Absent Without Leave" unless she provided medical documentation indicating she was unable to work. *See* Pl.'s SOF ¶¶ 113–14.

On May 6, 2004, Solomon contacted Cozzens, seeking medical documentation because "[she] ha[s] been unable to return to work since" April 23, and indicating that she did not know when she would be able to return. *See* Def.'s SOF ¶ 87; Pl.'s SOF ¶ 115. On May 10, Cozzens wrote a letter to USDA that stated that Solomon's "prognosis at this point is guarded" and that "the severity of [Solomon's] current situation has prevented her from attending work." *See* Def.'s SOF ¶¶ 88–89; Pl.'s SOF ¶¶ 118–19. This letter appears to have reached medical staff at USDA but not Solomon's supervisors, as on May 13 French again sent an e-mail to Solomon indicating that she would be kept on Absence Without Leave status until she provided medical documentation. *See* Pl.'s SOF 124–125. [redacted] *See* Def.'s SOF ¶ 91; Pl.'s SOF ¶ 154.

During this time period, Solomon filed timecards every two weeks requesting "advance[d] sick leave;" these requests were denied, forcing Solomon to take unpaid leave. *See* Pl.'s SOF ¶¶ 197. On May 19, a supervisor emailed Solomon indicating that advanced sick leave would be approved only if Solomon provided documentation of an expected date of return to work. *See* Pl.'s SOF ¶¶ 198. On May 26, Solomon asked French whether it would "be possible for [her] to telecommute on a part-time schedule until [she] is able to return to work." *See* Def.'s SOF ¶ 94; Pl.'s SOF ¶ 131. French responded to Solomon that since "you are not available for duty and your physician has indicated that you['re] totally incapacitated, we will not consider you for telecommuting." *See* Def.'s SOF ¶ 95; Pl.'s SOF ¶ 136.

On June 2, 2004, Cozzens wrote another letter to USDA. *See* Def.'s SOF ¶ 90; Pl.'s SOF ¶ 154. The letter informed the agency [redacted] and stated: "Currently, Ms. Solomon is unable to work due to the severity of her psychiatric symptoms and should be placed on short-term disability leave. As her status improves, Ms. Solomon will be able to return to work, initially on a part-time basis. Also, depending on her level of functioning at the time of her return to work, other accommodations may need to be in place. I would estimate that a tentative return to work date would be mid-July." Def.'s SOF ¶ 91.

On June 12, Solomon asked an agency human resources official for the source of the agency's policies on leave and telecommuting. *See* Pl.'s SOF ¶ 138; Pl.'s Exs. at 1421. The official responded that requests to telecommute were considered on a "case

by case basis" and that an employee unable to work for medical reasons would not be considered for telecommuting. *See* Pl.'s SOF ¶¶ 139–40. Solomon maintains that, contrary to this assertion, "there was a history in the agency of permitting other employees who were physically unable to work in the office to telecommute," citing employees who did so, among other things, while on maternity leave, after having surgery, and after breaking an ankle. *See* Pl.'s SOF ¶¶ 141–146.

On July 9, 2004, Solomon asked French to be placed in the "leave donor" program, by which other employees could donate their leave time to her; Solomon had requested entrance into the program earlier but was told she was ineligible until exhausting her own accumulated leave. *See* Pl.'s SOF ¶¶ 222–27; Def.'s SOF ¶ 96. This request was approved, and Solomon received 56 hours of paid leave from her fellow employees. *See* Pl.'s SOF ¶¶ 228, 230; Def.'s SOF ¶ 98–99. Solomon complains that she was not approved for the program until nearly a month after her supervisor recommended her approval and that the agency sent notice only to national headquarters employees, even though "most of the people Solomon worked with were located outside DC." *See* Pl.'s SOF ¶ 229.

On July 19, 2004, Solomon wrote to Cozzens indicating that she had decided to apply for permanent disability retirement. At that time, Solomon stated, "I can no longer continue to fight with my employ[er] for disability accommodations." *See* Pl.'s SOF ¶ 238; Def.'s SOF ¶¶ 102–03. On August 30, Solomon applied for immediate disability retirement, stating in her application that "[s]ince April 2004, I have been unable to work because my medical condition remains in crisis [redacted]" *See* Def.'s SOF ¶ 105. In her retirement application, Solomon indicated that she had re-

quested accommodations in the form of "a flexible work schedule, relocation of work station, advanced sick leave and entry into leave donor program" and that USDA had been unable to grant the request. *See* Pl.'s SOF ¶ 251; Def.'s SOF ¶ 106. Cozzens also submitted a letter in support of Solomon's application for retirement benefits, opining that "[i]t has become clear that disability retirement is the only viable option in this case." Def.'s SOF ¶ 109. On September 9, a USDA official filed a "certification of reassignment and accommodation efforts" in connection with Solomon's FERS application; this document responded affirmatively to a question asking whether "the medical evidence presented *to* the agency shows that accommodation is not possible due to [the] severity of [the] medical condition and the physical requirements of the position." *See* Pl.'s SOF ¶ 254. Solomon's retirement took effect on January 5, 2005. *See* Def.'s SOF ¶ 111.

Once the present case was underway, the parties took various depositions. Much of this testimony was devoted to interpreting the events that took place in late 2003 and the beginning of 2004. The parties each now highlight various aspects of this testimony, and the Court will not now attempt to capture it all. Most germane to the present motion are two segments of testimony by Solomon herself. First, Solomon testified regarding Dr. Cozzens' requests for a "flexible work schedule." *See* Pl.'s SOF ¶¶ 81–82. Solomon was asked, "Do you understand a flexible schedule to be one in which you could come to work if you felt able to work that day but you would have the ability not to come to work if your depression prevented it?" Solomon responded, "Yeah, as with any illness, yeah. I mean, I'm not one to take off just to take off." Solomon Dep. 109:13–18. Solomon was then asked, "Did you understand the flexible schedule to be

one in which you could leave work during the day if you felt unable to continue working as a result of your depression?" Solomon responded, "Or go to the health unit or whatever, yes." *Id.* 109:19–22. A few questions later, Solomon was asked, "Did you understand the flexible schedule to enable you to come to work late if your depression prevented you from coming to work on time?" Solomon responded, "That's what I had been doing for months . . . Yes." *Id.* 110:18–24. Second, Solomon testified regarding her job responsibilities and, more specifically, the need to meet certain deadlines. The official description of Solomon's position indicated that the job had "short deadlines and precise time frames" for completing assignments, and Solomon confirmed that "[t]here were always deadlines" and that "that's the nature of the work." *See* Def.'s SOF ¶¶ 68–70. Solomon testified that some of these deadlines were "sprung" on her internally by others at USDA and that others were generated by OMB or Congress. *See* Def.'s SOF ¶¶ 70–71.

### c. *Analysis*

The determinative question here is whether the accommodations Solomon sought from the USDA were unreasonable as a matter of law. Solomon's requests for accommodations from the USDA can be divided into two distinct time periods, the period leading up to and including Solomon's final day on April 24, 2004 and the subsequent period leading up to her decision in July 2004 to file for disability retirement.

■ With respect to the first period, Solomon's accommodation requests pertained to her work space (cubicle) and schedule. Solomon requested both that her cubicle be moved to a quieter area and that she be allowed to install a privacy curtain. Her request to move to a differ-

ent location was not answered and her request to install a privacy curtain was temporarily granted. Regarding her work schedule, Solomon's first request, to "work flex-time without recording the time accordingly," as she understood other employees to be doing, was rejected by her supervisor. Following that request, Solomon's next request appears to have been framed not as a disability accommodation but rather through ordinary bi-weekly timecards, which were regularly approved by her supervisor with substantial absences. Solomon herself then raised the issue of her "erratic" leave and mentioned her disability, prompting her supervisor to suggest medical documentation, which was provided by Dr. Cozzens. Solomon's second-line supervisor then expressed concern about her erratic leave and ordered her to remove the cubicle curtain for safety concerns. Following some back-and-forth between Solomon and her supervisors, Solomon was ultimately told she would not be permitted to work past 6 p.m., prompting her ultimate departure and then retirement.

As noted above, D.C. Circuit precedent makes clear that an employee's request to work "whenever he or she wants" is unreasonable as a matter of law. *See Carr,* 23 F.3d at 531. On the other hand, "specific and well-defined accommodations," as the court stated in *Scarborough,* 190 F.Supp.2d at 26 n. 21, are not unreasonable. Here, the parties disagree about what exactly Solomon was requesting from USDA. The Secretary maintains that Solomon's request was in the "work whenever you want" category, while Solomon argues that she primarily sought the flexibility to be able to work more hours at certain times to make up for hours that she missed.

This case falls somewhere between *Carr* and cases (*Langon* and *Breen*) in which

the requests for modified work schedules were found reasonable. Unlike in *Carr*, in which the employee's essential job duties included meeting a daily deadline, here the Secretary has pointed to no particular deadline that Solomon's absences interfered with meeting or any actual deadline that Solomon missed during the period from late 2003 to April 2004 in which she was often absent. Indeed, Solomon seems to have tried during this period to meet her deadlines despite her condition, and her supervisor did not object (and may have even approved of) the arrangement. On the other hand, Solomon agreed in her deposition testimony that her job did require meeting frequent deadlines, and, considering how often she was absent from work, it may have merely been good luck that she was able to meet those deadlines with such extensive absences. In any case, how the situation may have fortuitously worked out previously is not really relevant to whether the request was reasonable. An employer may tolerate even an unreasonable request from time to time, The case law makes clear that the nature of the request must be evaluated for reasonableness as a matter of law. Unlike in *Langon* and *Breen*, in which the employees sought "specific and well-defined accommodations," here Solomon sought, as in *Carr* and Scarborough. a "work whenever the employee wants" schedule. Because such an accommodation request is unreasonable as a matter of law, Solomon's claim under the Rehabilitation Act must fail.

Considering the contemporaneous record (putting aside, for the moment, Solomon's deposition testimony), it is undisputed that Solomon requested more than 110 hours of leave in a ten week period in the beginning of 2004. Solomon's communications with her supervisors in March and April 2004 gave no reason to believe that she expected any deviation from this prac-

tice going forward. Her request can only reasonably be interpreted, then, as seeking to be absent from the workplace for a very substantial proportion of each work week. Furthermore, rather than a predictable or regular modified work schedule, Solomon explicitly suggested that she wanted to take it "day by day." It does appear that Solomon's most frequent behavior was to come in late and then stay late, but she did not seek to shift her schedule in this matter on any predictable or regular basis. And her request was not limited to shifting her schedule later in the day; she maintains even now that her request might have included, for example, "le[aving] early one day because she had a bad afternoon." Pl.'s Opp'n at 20. That Solomon's request was for such an open-ended schedule is confirmed by the fact that she explicitly requested "maxiflex," in which, according to Solomon, the employee's schedule is completely flexible. Solomon's deposition testimony further confirms that her request was intended to be interpreted as a bid to come to work whenever she wanted.

Regarding Solomon's request to modify her cubicle situation by moving its location and installing a privacy curtain, it would be difficult to say that such a request was unreasonable as a matter of law. On the other hand, the Court can imagine situations in which such a request would, indeed, be unreasonable. Such speculation is not necessary here because, assuming that the request was reasonable, there is no indication that Solomon would have been able to work with the cubicle modifications but without the "flexible schedule." Hence, in the language of the Rehabilitation Act, Solomon was not a "qualified individual with a disability" because she could not "perform the essential functions of the employment position" with only these accommodations. 42 U.S.C. §§ 12112(a), 12111(8). Solomon does not

state now that she would have been able to do her job with the cubicle modifications but without a "flexible schedule," and she certainly did not suggest this was the case when making the request to USDA. Solomon took down the curtain at the request of her supervisor and prompted confrontation only over the scheduling issue. The Court therefore need not address the cubicle-related request independently from the unreasonable request regarding Solomon's schedule.

To be sure, that Solomon's accommodation requests prior to leaving USDA were unreasonable does not mean that her supervisors' behavior was especially reasonable. It is not immediately clear why Solomon's supervisors objected to her staying late to work, rather than to her absences directly. Of course, Solomon's desire to work late and her unreasonable request to work whenever she liked were related; Solomon sought to work late in order to compensate for the unscheduled hours she was absent. But it is nonetheless odd that Solomon's supervisors voiced their objection not to her absence but to her presence, especially if other employees were permitted to work late. Nonetheless, since the inquiry under the Rehabilitation Act is whether the employee could work with reasonable accommodations, and Solomon could not, this supervisory behavior is not really relevant to the inquiry at hand.

Following Solomon's departure from USDA on April 24, 2004, her accommodation requests only became more unreasonable. It is certainly unfortunate that these requests may have been prompted by Solomon's deteriorating health, but this fact does not change the character of her requests. Solomon first indicated that she was completely unable to work. She then asked to telecommute part-time until she became able to work. There was no indication that Solomon intended this part-time, telecommuting schedule to be any more regular than her previously requested schedule. If working whenever one likes at the office is an unreasonable request as a matter of law, then surely working whenever one likes at home is an even more unreasonable request.

Regarding the dispute between Solomon and USDA over "advanced sick leave" and the "leave donor" program, Solomon's requests here were not actually for accommodations that would enable her to work. On the contrary, these disputes were about whether Solomon should be paid for certain hours she did not work. Hence, they are not relevant to a claim under the Rehabilitation Act.

The final request made to the agency, by Solomon's psychiatrist, was that Solomon would work on a "part-time basis." Again, no indication was made that this part-time schedule would be any more regular than the erratic part-time schedule Solomon had previously sought. And in any case, this request was framed as a hypothetical future accommodation, to begin when Solomon's condition improved, no sooner than mid-July 2004. Solomon's situation had not improved by that time, and she decided on disability retirement instead.

In sum, Solomon's request for accommodations was unreasonable as a matter of law because she sought a "work whenever she liked" schedule. *See Carr,* 23 F.3d at 531; *Scarborough,* 190 F.Supp.2d at 25–26. Her further requests either were even more unreasonable or would not have enabled her to perform her job's essential functions. Hence, Solomon's Rehabilitation Act claim fails and the Secretary's motion for summary judgment will be granted as to this claim.

## IV. *Retaliation Claim*

Solomon argues that the Secretary's denial of accommodations with respect to her

disability constituted retaliation, in violation of Title VII of the Civil Rights Act. She contends that the Secretary denied her accommodations in retaliation for an Equal Employment Opportunity ("EEO") complaint she made in 2003 alleging discrimination against her on the basis of race, reprisal, color, age, and disability. *See* Pl.'s Opp'n at 34. Solomon also maintains that she was denied accommodations in retaliation for the very act of requesting accommodations. *See* Pl.'s Opp'n at 35.

a. *Legal Standard*

 " 'In order to establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two.' " *Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d 647, 651 (D.C.Cir.2003) (quoting *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985)). For the second element, an action is adverse if a plaintiff can show "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir. 2006)) (other quotations omitted).

 "Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, 'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.' " *Talavera v. Shah,* 638 F.3d 303, 313 (D.C.Cir. 2011) (internal citation omitted) (quoting *Woodruff v. Peters,* 482 F.3d 521, 530 (D.C.Cir.2007)). Furthermore, an infer-

ence cannot be based on proximity when "too much time had passed to link the past activity to the challenged action." *Talavera,* 638 F.3d at 314. Under such circumstances, speculation is insufficient to support a finding of causality. *See id.* at 313; *see also Holcomb v. Powell,* 433 F.3d 889, 901 (D.C.Cir.2006).

b. *Parties' Submissions and Factual Record*

Solomon contends that the Secretary's denial of her request for accommodations qualifies as an adverse action. *See* Compl. ¶ 27, The Secretary counters that USDA denied only her "patently unreasonable" requests. Def.'s Mem. at 34. The Secretary also contends that Solomon has failed to show a causal connection between the denial of accommodation requests and the protected activity. *See id.* at 34. The Secretary argues that Solomon's EEO complaint occurred temporally too far prior to the denial of Solomon's requests to support an inference of retaliation, that the USDA officials who actually handled Solomon's requests did not have any motive for retaliation, and that Solomon is merely speculating that her complaint was the reason her requests were denied. *See id.* at 34–35. Solomon responds that she had "almost constant [Equal Employment Opportunity] activity" during the period in question, warranting a temporality inference of retaliation, and that the Secretary is mistaken as to which official retaliated against her, indicating that Solomon believes that Lawrence retaliated against her for an EEO complaint regarding Lawrence, *See* Pl.'s Opp'n at 38–39.

In December 2003, Solomon contacted a USDA EEO counselor, alleging discrimination with respect to two incidents involving leave. Solomon had worked with her supervisor for three hours to complete an emergency project in September 2003, but

her request for compensatory time for these hours was denied. *See* Pl.'s SOF ¶¶ 49–50. Then, in early December 2003, Solomon's supervisor Sylvia Booth alleged that Solomon was absent from the office for 90 minutes; Solomon denied her absence and refused to sign a "leave slip" for the period, so Booth charged Solomon as "Absent Without Leave." *See* Pl.'s SOF ¶¶ 51–52. On December 18, Solomon contacted an EEO counselor about the two incidents. *See* Pl.'s SOF ¶ 53. The EEO counselor then met with Solomon's other supervisor, Deborah Lawrence, who was named in the counselor's later report as the "Responding Official." Pl.'s Opp'n at 35; *see* Pl.'s Exs. at 1556–59. Solomon declined an offer to settle the claim informally by converting her AWOL time to Leave Without Pay. *See* Pl.'s Exs. at 1556–59; 1762–64. A "Notice of Right to File Formal Complaint" was then issued on February 10, 2004, *See* Pl.'s SOF ¶ 54. The EEO counselor's report was issued on March 16, 2004. *See* Pl.'s SOF ¶ 55; Pl.'s Exs. at 1556–59. On March 22, 2004, Solomon made a request for amicable resolution of the AWOL charge. *See* Pl.'s SOF ¶ 56. On April 12, 2004, Solomon filed a formal complaint of discrimination. *See* Pl.'s SOF ¶ 57. Solomon continued to make informal discrimination complaints thereafter. *See* Pl.'s SOF ¶¶ 58–59.

#### c. *Analysis*

■ The Court finds that Solomon's Title VII retaliation claim must fail for the same reason her Rehabilitation Act claim does: as a matter of law, she could not have been reasonably accommodated. A failure to grant Solomon requested accommodations cannot be "adverse" if she could not reasonably have been accommodated.

As discussed above, Solomon's request for a flexible schedule was unreasonable as a matter of law because Solomon requested a "work whenever she wanted" schedule. And Solomon has never suggested that she would have been able to perform her job responsibilities without being able to work whenever she wanted, even if she had been granted other accommodations. Hence, the denial of Solomon's request was not adverse.

■ To be sure, as noted above, there were elements of the request for accommodations that Solomon made while still at USDA that individually may (or may not) have been reasonable, such as her request to have her cubicle moved and to install a cubicle curtain. It is not immediately clear either that these requests should be considered apart from the unreasonable schedule request or, if considered alone, that their denial rises to the level of an adverse employment action. Furthermore, Solomon's request to move her cubicle's location was never explicitly denied by USDA, and the causal connection between Solomon's EEO activity and the treatment of this particular request is weak because the allegedly retaliating official, Lawrence, actually did try to have the request fulfilled. But even if the Court were to consider these requests separate and apart from the unreasonable scheduling accommodation requests, and even if the Court were to assume that their denial was an adverse employment action by Lawrence, Solomon's retaliation claim would fail as a matter of law because Solomon cannot make out a causal connection between the denied requests and her protected activity.[5]

Solomon has put forward no affirmative evidence of a causal connection between

---

5. Indeed, even if the Court were to assume that the denial of Solomon's request for a flexible schedule was an adverse employment action (despite its unreasonableness), the result would be the same because the causal connection has not been established.

her EEO complaint and the denial of her accommodation requests. Instead she must rely on an inference from the temporal proximity of her protected activity and the allegedly adverse action. But Solomon's assertions fall into the realm of speculation and therefore fail as a matter of law. The Secretary has offered a credible explanation of why USDA denied Solomon's requests (the agency thought they were unreasonable), and too much time passed after the protected activity to warrant an inference of causality based on proximity.

Solomon made her informal allegation to the EEO counselor on December 18, 2003 and her formal complaint on April 32, 2004. Lawrence was contacted regarding Solomon's informal allegation sometime in December 2003. Lawrence sent Solomon the memorandum ordering Solomon to remove the cubicle curtain and seeking medical documentation regarding Solomon's schedule-related accommodations on April 10, 2004. Lawrence was therefore notified of Solomon's informal allegation more than three months prior to the allegedly retaliatory action, and the action occurred before, not after, Solomon formalized her complaint. Solomon cannot, of course, have been retaliated against for making the formal complaint before that event happened. And the three months that elapsed between Lawrence's notification of the informal allegation and the alleged retaliation is too much time to warrant an inference based on temporality. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be "very close" to establish sufficient evidence of causality). Lawrence was apparently Solomon's "second-line supervisor" for the entirety of this time, and Solomon has not explained why Lawrence would have wait-

ed more than three months before retaliating. The only intervening EEO activity during this time was the issuance of the EEO counselor's report and Solomon's request for amicable resolution of the charge. Beyond a vague allusion to her "constant EEO activity," Solomon has not suggested how either of these events could have possibly triggered retaliation, given that Lawrence had been notified of Solomon's complaint well before the denials occurred. Lawrence's letter to Solomon indicates it was, in fact, responding to Solomon's recent emails. Considering this timeline, Solomon can only speculate that Lawrence might have been retaliating against her for conduct transpiring several months earlier,

█ Regarding the requests Solomon made after her departure from USDA, the causal connection between the denial of the requests and the EEO activity is extremely weak because different officials were involved in dealing with those requests. They include seeking payment for time that Solomon did not work and a request to return to work by telecommuting part-time. There is no evidence in the record that Lawrence, the allegedly retaliating official, was involved in Solomon's affairs after her departure from the agency. The record instead indicates that French handled these requests, in consultation with human resources officials. These officials apparently had no involvement in the EEO issue and therefore would have no reason to retaliate against Solomon on this basis.

Finally, the Court is not persuaded that Solomon can make out a retaliation claim on the theory that USDA retaliated against her for making accommodation requests by denying her accommodation requests. It is possible to imagine circumstances under which a later denial of an accommodation request could constitute

**77**

retaliation for making an earlier request. Here, however, Solomon has not made any attempt to distinguish the protected request from the adverse denial; the alleged adverse action and protected activity are one and the same. By this logic, any claim under the Rehabilitation Act for denial of an accommodation request would also provide an identical retaliation claim. That would make no sense.

In sum, the denial of an unreasonable accommodation request does not constitute adverse action. Furthermore, even assuming that the Secretary had taken some action that was. adverse to Solomon, Solomon has not established a causal connection between the allegedly adverse action and the protected activity. Hence, Solomon's Title VII retaliation claim fails and the Court will grant the Secretary's motion for summary judgment on this count.

V. *Conclusion*

As described above, Solomon's Rehabilitation Act claim fails because the accommodation Solomon requested—specifically, a "work whenever she wants" schedule—was unreasonable as a matter of law. Solomon's Title VII retaliation claim also fails because Solomon has not established an adverse action that was caused by her protected activity. Accordingly, the Court will grant the Secretary's motion for summary judgment on both counts. A separate order has been issued on this date.